# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


## 09-1089


**STATE OF LOUISIANA**

**VERSUS**

**DANIEL L. PEGUES**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 6894-07
HONORABLE DAVID A. RITCHIE, PRESIDING
**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses G. Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Elizabeth A. Pickett, Judges.


Thibodeaux, Chief Judge, dissents in part and assigns written reasons.


**CONVICTION AND SENTENCE FOR MANSLAUGHTER AFFIRMED;
CONVICTION AND SENTENCE FOR ATTEMPTED SIMPLE
BURGLARY REVERSED.**

**John F. Derosier, District Attorney**
**Carla S. Sigler, Assistant District Attorney**
**1020 Ryan Street**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P.O. Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Daniel L. Pegues**

**COOKS, Judge.**

_____FACTS AND PROCEDURAL HISTORY

On the evening of January 24, 2007, Alan Inzer, a deputy of the Calcasieu Parish Sheriff's Office, who was off-duty, was having drinks with friends at the Cajun Wharf in Lake Charles. At some time after midnight, the deputy and one of his friends, Michael Horton, left to go to another bar. According to Mr. Horton, while on the way, Deputy Inzer suddenly turned into a parking lot, and stated something like "these guys are breaking in the place." The business was Mudd Fashions on Ryan Street in Lake Charles. Mr. Horton explained that when Deputy Inzer turned into the parking lot, two or three people took off running.

After pursuing them in his vehicle for a short distance, Deputy Inzer stopped his truck and exited it to continue the chase on foot. The deputy told Mr. Horton to call 911. While on the phone to 911, Mr. Horton heard gun shots. Deputy Inzer was found shot to death, lying on the ground. The deputy's gun, which was loaded, was found in its holster inside his left boot.

Defendant, Daniel L. Pegues, was charged by bill of indictment with first degree murder, a violation of La.R.S. 14:30, and attempted simple burglary, violations of La.R.S. 14:27 and 14:62. The State amended the first degree murder charge to second degree murder.

At Defendant's trial, Dr. Terry Welke, the forensic pathologist who performed the autopsy, testified Deputy Inzer suffered from four gunshot wounds. One of the bullets entered the victim's outer left thigh, exited the body and reentered the right thigh and then exited. Two shots to the chest were fatal, and the fourth shot was a graze wound.

Zeb Johnson, an expert in the field of forensic investigation, testified he

believed Deputy Inzer was standing still when he was first shot. Mr. Johnson explained that the shot to the legs was a straight shot, and the lower body had to be "equally straight and equally together when the shots were fired." Mr. Johnson noted that the other gunshot wounds indicated movement by the victim.

On cross-examination, Mr. Johnson acknowledged that the victim was found with his left pants leg pulled up, and it was possible the victim was first shot while he was reaching down to get his gun from his boot, then stood up, and was shot in his legs.

The investigation revealed three suspects, Elmer Franklin, Tromale Guy, and Defendant. Mr. Franklin testified when he saw the lights of the truck pull into the parking lot of the business, he started to run. Mr. Franklin stated while he was running, he heard a gunshot, he looked around, and saw Defendant "right there standing up and a man that fell, like, on the ground." Mr. Franklin testified after he started running again, he heard several more shots.

Following a trial by jury, the jury returned a verdict of manslaughter and attempted simple burglary. Defendant was subsequently sentenced to forty years at hard labor for manslaughter and six years at hard labor for attempted simple burglary, with the sentences to run concurrently to each other. Defendant filed a motion to reconsider sentence, which the trial court denied.

On appeal, Defendant assigns the following errors:

1. Defendant was denied a fair trial due to the trial court's denial of his motions for a change of venue; the trial court erred in finding he failed to meet his burden or proof.

2. Defendant was subject to double jeopardy when he was convicted of both manslaughter and attempted burglary, and received sentences for each.

3. His sentence of forty (40) years for manslaughter is excessive under the circumstances of this case.

Defendant asserts he was denied a fair trial because the trial court denied his motions for a change of venue. A hearing on Defendant's change of venue motion was held on September 5, 2007, and the motion was denied. A second motion seeking a change a venue was urged, and the hearing was held on June 26, 2008. The trial court denied the motion. During *voir dire*, the motion for change of venue was re-urged, and arguments were made for the change by defense counsel. The trial court rejected the motion and defense counsel objected.

Defendant asserts the trial court failed to give proper consideration to relevant factors in determining a change of venue. Defendant argues the primary reason for the change of venue was the case involved the killing of a police officer, which was an "inflammatory factor."

The State responded the fact that the case involved a law enforcement officer did not warrant a change of venue. They also argued Defendant failed to prove the "utter corruption of his trial venue by media coverage."

In *State v. Clark,* 02-1463 (La. 6/27/03), 851 So.2d 1055, *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1433, (2004), the court explained in pertinent part:

> A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. 1, § 16; *State v. Brown*, 496 So.2d 261, 263 (La.1986). To accomplish this end, the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue. *State v. Frank*, 99-0553, p. 11 (La.1/17/01), 803 So.2d 1, 12 (citations omitted).

Changes of venue are governed by La.C.Cr.P. art. 622, which provides,

> A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.

In deciding whether to grant a change of venue, the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.

La.C.Cr.P. art. 622.

In *State v. Frank*, we thoroughly examined the law pertaining to change of venue and Article 622. We noted Article 622 was adopted in 1966 and changed the test previously used by courts. *Frank*, 99-0553 at pp. 11-12, 803 So.2d at 12-13 (citing *State v. Bell*, 315 So.2d 307, 309 (La.1975)). We also observed that subsequent to the adoption of Article 622, this court in *Bell* enumerated several relevant factors that would help guide the judiciary in determinations of whether to change venue under Article 622. Those factors are: 1) the nature of pre-trial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. *Bell*, 315 So.2d at 311.

In *Bell*, the court instructed that under the new provision, it was no longer appropriate for a trial court to inquire only as to whether the individual prospective jurors could be fair and impartial and uninfluenced by what they had heard or had seen outside the court. *Id*. at 313. The focus must extend beyond the prejudices and attitudes of the individual venire persons, and the defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, that there exists prejudice or influences within the community at large that would affect the jurors' answers during voir dire or the testimony of witnesses at the trial, or that for any other reason, a fair and impartial trial could not be held in the parish. *Id*. The trial court's ultimate determination must be of the community's attitude toward the defendant. *Id*.

Subsequent to *Bell*, we reiterated that the fact that a jury can be selected, i.e., that the requisite number of jurors are not subject to a valid challenge for cause, does not mandate the conclusion that a motion for change of venue was properly denied by the trial court. *State v. Rudolph*, 332 So.2d 806, 809 (La.1976). We explained that a change of venue may be necessary to ensure a fair trial even if, individually, each juror is not susceptible to a valid challenge for cause, because the overriding state of the public mind against the defendant may cause the jurors not to answer completely and honestly during voir dire. *Id*.

Despite the substantive change to Article 622, the burden of proof

remains on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. *State v. Vaccaro*, 411 So.2d 415, 424 (La.1982). Whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. Id.

Both this court and the United States Supreme Court have instructed that the defendant cannot meet his burden merely by showing that there exists public knowledge of the facts surrounding the offense or the alleged offender. *Frank*, 99-0553 at p. 14, 803 So.2d at 14, 15. As the Supreme Court noted in 1961, -"[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity...." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial. *Frank*, 99-0553 at p. 14, 803 So.2d at 15. Thus, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime. *State v. Thompson*, 516 So.2d 349, 352 (La.1987), *cert. denied*, 488 U.S. 871, 109 S.Ct.180, 102 L.Ed.2d 149 (1988).

On review of a denial of change of venue, courts will primarily inquire as to the scope and nature of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial, in order to ascertain whether prejudice existed in the mind of the public which prevented the defendant from receiving a fair trial. *See, e.g., Murphy v. Florida*, 421 U.S. 794, 802-3, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975), *State v. Hoffman*, 98-3118 (La.4/11/00), 768 So.2d 542, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). The seven factors enumerated by this court in *Bell* help facilitate the inquiry into the nature and scope of publicity disseminated in the community where a crime occurred. Courts must distinguish, however, largely factual publicity from that which is invidious or inflammatory, as they present real differences in the potential for prejudice. *Murphy*, 421 U.S. at 800-1 n. 4, 95 S.Ct. at 2036 n. 4.

Additionally, courts have examined the number of jurors excused for cause for having fixed an opinion as another gauge of whether prejudice exists in the public mind. *Id.* at 803, 95 S.Ct. at 2037-38; *State v. Wessinger*, 98-1234, p. 7 (La.5/28/99), 736 So.2d 162, 173, *cert. denied*, 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999). As the Supreme Court noted, in a community where the majority of prospective jurors will openly admit to a disqualifying prejudice, the reliability of other jurors' assurances that they are impartial and have no preconceived

notion may be drawn into question. *Murphy*, 421 U.S. at 803, 95 S.Ct. at 2037. Yet, the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is insufficient to rebut the presumption of the juror's impartiality. *Id.* at 800, 95 S.Ct. at 2036. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (quoting *Irvin*, 366 U.S. at 723, 81 S.Ct. at 1642).

Thus, as we explained in *Frank*, there is not a bright line test for determining the degree of prejudice existing in the collective mind of the community. *Frank*, 99-0553 at p. 16, 803 So.2d at 16. There is no established minimum level of exposure to negative publicity or percentage of challenged jurors that illustrates a corruptive atmosphere mandating venue transfer. *Id.*; *Hoffman*, 98-3118 at p. 8, 768 So.2d at 555; *Wessinger*, 98-1234 at p. 7, 736 So.2d at 173. Therefore, we have advised that a comparison to other cases is proper when analyzing the question of whether a change of venue was required due to the number of prospective jurors whose ability to be impartial had been corrupted by publicity. *Frank,* 99-0553 at p. 16, 803 So.2d at 16; *Wessinger*, 98-1234 at p. 7, 736 So.2d at 173.

*Id.* at 1069-72 (footnotes omitted).

## THE BELL FACTORS

*Nature of pre-trial publicity*:

At the hearing on the motion for change of venue, Brett Downer, the editor of the Lake Charles American Press newspaper, testified the murder of Deputy Inzer was one of the biggest stories of 2007. Mr. Downer testified he estimated about 70,000 people out of the 100,000 in Calcasieu Parish read the newspaper. Mr. Downer recalled numerous stories about deputy Inzer's murder. He testified that the day before the hearing, on June 25, 2008, a story ran in the paper regarding the beginning of the trial. The defense admitted into evidence all of the pertinent newspaper articles.

John Ware, the general sales manager of KPLC television, testified when a story runs for multiple days on the different news programs offered by KPLC, approximately 85.1% of households in the viewing area, which included Calcasieu Parish, would view it.

Theresa Schmidt, a news reporter for KPLC, testified she did at least a dozen stories regarding the case. The most recent story she recalled on the case was aired on May 26, 2008. Ms. Schmidt testified KPLC televised the live press conference of the Lake Charles Police Department when the Defendant was either identified as the suspect or arrested. Ms. Schmidt explained that normal daily programming was interrupted in order to bring the press conference live. Additionally, she recalled that the funeral of Deputy Inzer was carried live on KPLC.

The court minutes reflect that the jury pool consisted of one-hundred and seventy-two people. The trial court asked the prospective jurors if anyone had heard about the case. One-hundred and one responded they had heard about the case, which is approximately sixty percent of the total jury pool. These jurors were questioned individually by the trial court, the State, and the Defendant's counsel, to determine whether the pre-trial publicity affected their opinion; specifically, whether or not the knowledge they had about the case would affect their ability to presume Defendant was innocent. The court minutes indicate out of the one-hundred and one which were questioned individually, twenty-six were excused mainly because they admitted knowledge of the case would hinder them from presuming Defendant innocent. Defendant submitted fifteen challenges for cause, of which two were granted. However, a review of the record indicates none of these challenges were a result of knowledge gained by pre-trial publicity, but were for other reasons. Defendant used all twelve of his peremptory challenges.

*Comments of governmental officials:*

In closing arguments at the second hearing held on the motion seeking change of venue, Defendant's attorney pointed out that the press conference, which Ms. Schmidt referred to during her testimony, was called by the chief of police.

Additionally, he stated there were numerous press releases by the Calcasieu Parish Sheriff's Office and the District Attorney's Office. The newspaper articles admitted into evidence by the defense contained information or statements from officials, but were written by reporters from the American Press.

One of the newspaper articles, described the emotional impact of the death of the victim on Tony Mancuso, Sheriff of Calcasieu Parish. The article states in pertinent part:

> The feelings of joy and relief that followed the announcement of the arrests pale in comparison to the pain and sorrow Inzer's personal and professional family are contending with.

> Mancuso doesn't deny that Inzer's death will have longterm [sic] effects on all area law enforcement agencies.

> "We will learn from this. But it's difficult to go tell the family of somebody that you personally know and worked with that they were killed." said Mancuso. . .

Additionally, in the Lake Charles American Press there was a photograph of Sheriff Mancuso presenting the Law Enforcement Award to Deputy Inzer's mother, and a photograph of the Defendant, while handcuffed, being escorted by several police officers.

In the "Legal" section of the Lake Charles American Press, it was reported that the Calcasieu Parish Police Jury adopted a resolution forwarding condolences to the family of the deputy, and the full condolence was printed.

*Length of time between comments and trial:*

The testimony of Ms. Schmidt suggested coverage of the incident began several hours after the murder happened, on January 25, 2007. The last televised news story was on May 26, 2008, and the last newspaper article was on June 25, 2008. The trial commenced in January, 2009.

*Severity and notoriety of the offense:*

Defendant shot the victim several times, and he died at the scene. Clearly, the victim being a deputy who was shot while in the pursuit of criminal suspects made the crime of extreme interest to the community, as reflected by the extensive newspaper and televised news coverage of the offense.

*The area from which the jury was drawn:*

Testimony at the hearing on the motion for change of venue indicated there were around 100,000 residents in Calcasieu Parish. The jury pool was one-hundred and seventy-two people out of which sixty percent had heard about the case, and twenty-six percent were excused for cause, because of their predisposition to finding Defendant guilty.

*Other community events that either affect or reflect the community attitude toward defendant*:

In closing arguments at the hearing on the motion for change of venue, the Defendant's attorney mentioned, in support of this *Bell* factor, that one of the articles in the American Press, which referred to the victim's death, was entitled "For Lake Charles Mid-City is Crime Central." This article explained how that area of Lake Charles had the highest crime rate in the city.

*Factors that likely affect the candor and veracity of prospective jurors:*

The majority of jurors with a pre-existing opinion stated they were able to put it aside, and base their verdict only upon evidence presented at trial. As noted above, only twenty-six percent of the prospective jurors were excused for cause, mainly due to predetermined guilt based upon pre-trial publicity.

## *APPLICATION:*

In this case, some of the *Bell* factors were met; however, after examining the statistics, the exhibits and testimony on the pre-trial publicity, the responses of the

prospective jurors, and reviewing the applicable jurisprudence, we find these factors, when compared to similarly situated cases in which venue was not changed, did not warrant a change of venue. In *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297, 315, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006), the capital murder defendant sought change of venue based on pre-trial publicity which was denied by the trial court. On appeal, the court found no error in the denial. The court explained that while most of the prospective jurors had knowledge of the case through media sources or through general community knowledge, media coverage was primarily factual in nature, the record showed that each prospective juror was individually questioned concerning his or her knowledge of the case and opinions concerning the defendant's guilt or innocence.

In *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000), the defendant challenged the trial court's denial of change of venue. The court found the trial court did not err, noting that 72 out of 90 prospective jurors (80%) had awareness of the case before trial, and the trial court questioned each prospective juror individually in "painstaking detail," regarding their knowledge of the case, and their opinions concerning the defendant's guilt or innocence. *Id.*

Finally, Defendant asserts the primary consideration for changing the venue was the victim being a police officer which was inflammatory in itself. Defendant claims "that it is difficult to find any published case in Louisiana where a request for a change of venue has been denied in a prosecution for such a killing." Defendant fails to cite any cases to support this assertion. Moreover, contrary to this assertion, we note several cases involving the murder of police officers, where change of venue was denied. In *State v. Logan,* 07-739 (La.App. 5 Cir. 5/27/08), 986 So.2d 772, *writ*

*denied*, 08-1525 (La. 3/13/09), 5 So.3d 117, *cert. denied*, __ U.S. __, 130 S.Ct. 142 (2009), a recently retired New Orleans police officer was shot at his home during the day. The defendant sought a change of venue asserting the pre-trial publicity would affect the defendant's right to obtain a fair and impartial jury. At the hearing on the motion, defense counsel noted there were twenty-five newspaper articles on the case, the story was front-page news, and the story was selected as one of the top ten news stories of 2003. Additionally, seventy-four percent of the prospective jurors were at least vaguely familiar with the case, and fourteen percent were excused for cause because of predetermined guilt based upon the pretrial publicity or being acquainted with family members involved in the case. *Id.* at 783. The trial court denied the motion, and on appeal, the court found the trial court did not abuse its discretion in denying the motion. *Id.* at 783.

In *State v. Bell*, 477 So.2d 759 (La.App. 1 Cir. 1985), *writ denied*, 481 So.2d 629 (La.1986), a deputy employed by the East Baton Rouge Parish Sheriff's Office was shot and killed, during the robbery of a convenience store; the deputy was in the store as a customer. The defense moved for a change of venue based upon the pre-trial publicity, which lasted in excess of five months, the severity of the offense, and the particular facts that the victim was a young deputy sheriff, with a wife and small children. The trial court denied the motion. On appeal, the court found the trial court did not err in denying the motion. *See also*, *State v. Bennett*, 454 So.2d 1165 (La.App. 1 Cir.), *writ denied*, 460 So.2d 604 (La.1984).

In *State v. Dillard*, 320 So.2d 116 (La.1975), the defendant was found guilty of murdering one police officer and of the attempted murder of two other officers. The defendant shot the police officers, during his arrest. The defense urged a change of venue based upon the pre-trial publicity, which was denied by the trial court. On

appeal, the court found the trial court did not abuse its discretion. *See also, State v. Brumfield*, 96-2667 (La. 10/20/98), 737 So.2d 660, (unpublished appendix at pp. 677-78), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1267 (1999), (where an off-duty police officer working a security detail was shot, during an armed robbery, and the supreme court found the trial court did not err in denying the change for venue motion based on extensive pre-trial publicity about the case).

After reviewing all of the above factors, we find Defendant failed to prove he was denied a fair and impartial trial. In fact, the jury returned a verdict of the lesser charge of manslaughter. This suggests the jurors were not inflamed by exposure to the pre-trial publicity. Accordingly, we find the trial court did not abuse its discretion by denying the motion for change of venue.

## ASSIGNMENT OF ERROR NO. 2

Defendant asserts he was subjected to double jeopardy when he was convicted of both manslaughter and attempted simple burglary, the underlying felony, and received sentences for each conviction. According to the Fifth Amendment of the United States Constitution and Louisiana Constitution Article I, § 15, no person shall be twice placed in jeopardy of life or liberty for the same offense. The purpose of these provisions is to protect a person from a second prosecution after he has already been acquitted or convicted of that offense, and *also to protect a person against multiple punishment for the same conduct. State v. Vaughn*, 431 So.2d 763 (La. 1983).

In support of his argument, Defendant cites *State v. Bradford*, 514 So.2d 535 (La.App. 3 Cir. 1987), *writ denied*, 523 So.2d 226 (La.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 97 (1988). In *Bradford*, this court addressed the issue of multiple punishments in a case where the defendant was convicted, in the same trial, of

attempted manslaughter and attempted armed robbery, where the attempted armed robbery was the underlying felony to support the conviction under La.R.S. 14:31(A)(2)(1). This Court wrote as follows:

> La.C.Cr.P. Art. 596 speaks of double jeopardy in terms of a second prosecution for the same offense, but its provisions also protect an accused from multiple punishment for the same criminal conduct. *State v. Vaughn*, 431 So.2d 763 (La.1983). Thus, further prosecution and conviction for attempted armed robbery, the enumerated felony, is precluded following a conviction of second degree murder. *State v. Stewart*, 400 So.2d 633 (La.1981); *State ex rel. Wikberg v. Henderson*, 292 So.2d 505 (La.1974). In *State v. Cotten*, 438 So.2d 1156 (La.App. 1st Cir.1983), convictions of attempted first degree murder and attempted armed robbery, the enumerated felony, were held to subject the defendant to double punishment for the same offense, and one conviction was reversed and vacated. Similarly, in *State v. Rogers*, 462 So.2d 684 (La. App. 4th Cir.1984), multiple convictions and sentences at a single trial for the crimes of attempted first degree murder and the underlying felony, aggravated arson, were held to subject the defendant to double jeopardy.
>
> In the present case the defendant was convicted of the responsive crime of attempted manslaughter on a charge of attempted first degree murder. At the same time he was convicted of attempted armed robbery, the underlying felony. Since defendant was in jeopardy of the offense of attempted first degree murder, this constitutes double jeopardy.
>
> We grant the relator's application for post-conviction relief. According to *State v. Doughty*, 379 So.2d 1088 (La.1980), in such cases, where multiple punishment has been erroneously imposed, "the appropriate procedure at the appellate level is to eliminate the effect of the judgment as to the less severely punishable offense." The attempted manslaughter judgment is the less severely punishable offense, and the conviction and sentence for attempted manslaughter is vacated.

*Id.* at 534.

The State responds that the manslaughter conviction was based upon the theory of specific intent to kill, which was proven at trial. In support of its assertion, the State cites *State v. Coates*, 27,287 (La.App. 2 Cir. 9/27/95), 661 So.2d 571, *writ denied*, 95-2613 (La. 2/28/96), 668 So.2d 365, which held that double jeopardy was not violated when a manslaughter conviction can rely on something other than an underlying felony. Ordinarily, we are left to determine on our own, from the facts

presented during trial, whether the jury relied on a basis other than the underlying felony to arrive at a verdict. However, in this case, the trial court specifically noted, in talking with the jury, that it returned a verdict of manslaughter, not based upon the specific intent to kill, but on the underlying felony, attempted simple burglary. The trial court took the unusual step of actually questioning the jury after trial regarding this issue and stated:

> I did visit with the jurors after the trial was over to try to - - and got a little bit of what their thought process was and I will say, Mr. Pegues, that you know, apparently your lawyer did a very good job of muddying the water a little bit to cause the jurors and, like I said they were unanimous in their verdict, you know, to cause them to believe that it was possible, that there was a doubt about whether you were the actual shooter. . . I believe the jurors thought he could of possibly been Elmer Franklin. *So you were convicted of manslaughter based on the fact that since they didn't feel certain that is was necessarily you, but because you were involved in . . . the attempted burglary, and that Deputy Inzer was murdered in the process of the commission of that crime that you were convicted of manslaughter.*

Thus, it appears the jury punished Defendant for both manslaughter and attempted simple burglary, where the underlying felony upon which the manslaughter conviction was based was the attempted simple burglary. Therefore, we find Defendant was punished twice for the same conduct. This violates double jeopardy, and, as was done in *Bradford*, we must "eliminate the effect of the judgment as to the less severely punishable offense." Defendant's sentence for manslaughter was forty years at hard labor, and his sentence for attempted simple burglary was six years at hard labor. The sentences were to run concurrent.[1] Thus, we reverse Defendant's conviction for attempted simple burglary.

## ASSIGNMENT OF ERROR NO. 3

In his last assignment of error, Defendant argues that his maximum sentence

---

[1] We note, due to the fact that the six-year sentence for attempted burglary was to run concurrent with the forty-year sentence for manslaughter, the time Defendant will spend in prison is not affected by our decision to vacate the attempted burglary sentence.

-14-

of forty years for manslaughter is excessive, especially considering he is a first felony offender.

The analysis for excessive sentence claims is well-settled:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-0838 (La.2/1/02), 808 So.2d 331 (alteration in original).

In *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-0433 (La.6/25/99), 745 So.2d 1183, our colleagues on the Fifth Circuit Court of Appeal noted three factors the appellate court should consider in reviewing a judge's sentencing discretion. They are:

1. the nature of the crime,

2. the nature and background of the offender, and

3. the sentence imposed for similar crimes by the same court and other courts.

*State v. Telsee*, 425 So.2d 1251 (La.1983); *State v. Richmond*, 97-1225 (La.App. 5 Cir. 3/25/98), 708 So.2d 1272.

*Id.* at 58.

*State v. Baker*, 06-1218, pp. 7-8 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, 89, *writ*

*denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *writ denied*, 07-1116 (La. 12/7/07), 969 So.2d 626.

In examining this particular sentencing, we find a different mode of analysis is appropriate because the sentence appears based upon a factor the jury rejected in assessing the State's evidence. During sentencing, the trial judge made the following remarks:

> Let me say I have, I guess just so that it's clear, you know, I did visit with the jurors after the trial was over to try to -- and got a little bit of what their thought process was and I will say, Mr. Pegues, that, you know, apparently your lawyer did a very good job of muddying the water a little bit to cause the jurors and, like I said they were unanimous in their verdict, you know, to cause them to believe that it was possible, that there was a doubt about whether you were the actual shooter or whether it was someone else, which your attorney and I believe the jurors thought it could of possibly been Elmer Franklin. So you were convicted of manslaughter based on the fact that since they didn't feel certain that it was necessarily you, but because you were involved in that burglary, the attempted burglary, and that Deputy Inzer was murdered in the process of the commission of that crime that you were convicted of manslaughter.

> But let me say this. I listened to the evidence. I heard everything that the jurors heard and it's clear to me that you were the murderer in this case.

> . . . .

> Well, I'm going to give you your sentence. I just need you to be quiet and let me say what I have to say and then I'm going to sentence you.

> In any event it was clear that you were the shooter. The evidence put the gun only in your hands, nobody else's hands. The testimony was clear about that, that you are the one that introduced the gun into this whole process. You were the only one out of all the parties involved whose DNA was not excluded from the gun. The fact that you were in such a hurry to get out of town and get on the bus that you went to Lafayette to get on the bus, and so many other things that pointed to you as being the shooter and the fact that -- and I guess you must have been the slow one because -- and you felt like you couldn't get away, so you hid behind a car and when Deputy Inzer stopped I guess to -- stopped his pursuit and decided to smoke a cigarette and you were standing behind that car you decided to pull out your gun and murder him. You know, you just didn't shoot him one time. I mean you shot him four times. Just

cold bloodedly murdering him. Maybe you were high on cocaine or whatever it was you were using that night, but that's not an excuse. It was because of your pure selfishness, that you didn't want to get caught trying to break into that store, that you decided to murder Deputy Inzer that night. Whether you knew he was a deputy or not, I suspect that you knew, but even if you didn't know it's absolutely cold blooded to stand there with that gun and gun him down like that, and so that's the way I saw the evidence. It was clear to me. Like I said, your lawyer did a good job of clouding, you know, the issue for the jury to cause them to have some doubt, but there's no doubt in my mind about who the killer was and it was you.

And so as a result of that I'm going to sentence you to serve 40 years. This is the maximum sentence I can possibly give you, is 40 years with the Louisiana Department of Corrections at hard labor without benefit of probation, parole, or suspension of sentence. I expect you to serve each and every day of that time. You know, I don't control whether you get any good time for that, but I expect you to serve [- -] if it had any bearing or if my saying this has any bearing on whether you get any good time or not, which I don't think it does, but I want to state for the record that I expect you to serve each and every day of that 40 year sentence.

And also with regard to the attempted simple burglary charge, you know, the maximum for that charge is 6 years. I'm going to give you the maximum of 6 years, however -- and the law I think is pretty clear and if you don't agree with me, Ms. Killingsworth and Mr. DeRosier, let me know, but I think the law is pretty clear that because the attempted simple burglary is the predicate offense for the manslaughter that that sentence has to be concurrent.

The trial judge's remarks indicate Defendant's sentence for manslaughter is based upon the judge's belief that Defendant is the man who shot the victim. Since the judge's remarks also show the jury had doubt on this very issue, it appears he substituted his personal judgment for that of the jury. Nonetheless, the jurisprudence indicates the sentence should be affirmed.

We note in *State v. Soraparu*, 93-1636 (La.App. 4 Cir. 1/19/95), 649 So.2d 1100, the defendant was charged with second degree murder, but the jury convicted him of manslaughter. The trial court imposed the maximum sentence. In reversing the sentence, a majority of the appellate court stated:

While we are aware of the aggravating factors the trial court

articulated, we are not persuaded that they justify the imposition of this sentence. This record does not establish that this defendant is the worst kind of offender and for that reason he should not receive the maximum sentence imposed. Moreover, at the time the defendant was sentenced, the sentencing guidelines which the trial court opted not to follow were still in effect.

Although the defendant was charged with second degree murder, the jury in this case found the defendant guilty of manslaughter. The jury verdict of manslaughter might have been a compromise verdict or even wrong-headed but it is not to be questioned. The jury, in finding the defendant not guilty of second degree murder cannot be legally wrong, and the trial court, as well as the appellate court, should honor that verdict.

The sentencing transcript clearly shows that because the trial judge disagreed with the jury's finding, he imposed the maximum sentence. The sentence was not tailored to the defendant nor the circumstances of the offense, nor was it imposed in response to a guilty plea.

*Id*. at 1105.

However, after the resentencing, and another remand by the fourth circuit,[2] the supreme court issued the following per curiam:

Granted in part. The decision of the Fourth Circuit is reversed insofar as it vacates the defendant's sentence and remands for resentencing before a different judge, and the sentence imposed by the trial court is reinstated. On appellate review of sentence, the only relevant question is "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Cook*, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." *State v. Sepulvado*, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, *State v. Franks*, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit. *State v. Wimberly*, 414 So.2d 666, 672 (La.1982). The trial court's finding in this case that the defendant committed a

---

[2]*State v. Soraparu*, 96-0116 (La.App. 4 Cir. 2/5/97), 688 So.2d 1320.

"cold and deliberate act" which would have fully justified the return of a verdict of second degree murder adequately supports the sentence imposed.

*State v. Soraparu*, 97-1027, p. 1 (La. 10/13/97), 703 So.2d 608.

In light of the Supreme Court's holding in *Soraparu*, we cannot say the trial judge abused his vast sentencing discretion. Therefore, this assignment of error lacks merit.

## DECREE

For the foregoing reasons, we affirm Defendant's conviction and sentence for manslaughter. However, we vacate Defendant's conviction and sentence for attempted simple burglary on the grounds it was a multiple punishment and thus violated Defendant's constitutional guarantee against double jeopardy.

**CONVICTION AND SENTENCE FOR MANSLAUGHTER AFFIRMED; CONVICTION AND SENTENCE FOR ATTEMPTED SIMPLE BURGLARY REVERSED.**

STATE OF LOUISIANA

VERSUS

DANIEL L. PEGUES


**THIBODEAUX, Chief Judge, dissenting in part.**


I disagree with the majority that a double jeopardy violation occurred. I would affirm the conviction and sentence for attempted simple burglary as well as the manslaughter conviction.

In *State v. Sandifer,* 95-2226 (La. 9/5/96), 679 So.2d 1324, the court explained that "the Double Jeopardy Clause, under both the additional fact and the same evidence tests, prevents an offender from being convicted of both a felony murder and the underlying felony. *State ex rel. Adams v. Butler*, 558 So.2d 552, 553 (La.1990)." *Id.* at 1329. *See also, State ex rel. Birtha v. State*, 01-1011 (La. 9/13/02), 824 So.2d 1179.

Mr. Pegues was charged with second degree murder, a violation of La.R.S. 14:30.1, which provides in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree

robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

The jury convicted Mr. Pegues of manslaughter, a violation of La.R.S. 14:31, which provides in pertinent part:

A. Manslaughter is:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person;

The elements of attempted simple burglary are "a person must have been shown to have the specific intent to enter a 'structure . . . with the intent to commit a felony or any theft therein.' R.S. 14:27, R.S. 14:62." *State v. Walker*, 328 So.2d 87, 88 (La.1976).

Clearly, as the majority observes, if the attempted simple burglary was the *only* basis for the manslaughter conviction, there would be a double jeopardy violation. However, the State presented sufficient evidence, in my view, to support the compromise verdict of manslaughter based on specific intent to kill.[1]

---

[1]In *State v. Carrier*, 95-1003, p. 6 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, 798, *writ denied*, 96-881 (La. 9/20/96), 679 So.2d 431, this court explained, in pertinent part:

In *State v. Prince*, 520 So.2d 778 (La.App. 3 Cir. 1987), *writ denied*,

The investigation indicated Deputy Inzer was standing still while smoking a cigarette when he was first shot, and he was shot at least three more times, with two fatal wounds to the chest. The deputy's gun, which was loaded, was found in its holster inside his left boot. Elmer Franklin testified that while he was running he heard a gunshot, he looked around, and saw Mr. Pegues "right there standing up and a man that fell, like, on the ground."

Consequently, as the record supports sufficient evidence to base the manslaughter conviction on specific intent to kill, there was no double jeopardy violation.

The basis for the majority's conclusion rests upon its improper consideration of the trial judge's inappropriate comments after speaking with the jurors. The majority agrees that the trial judge substituted his personal judgment for that of the jury. It even recognizes that "[t]he trial court took the unusual step of actually questioning the jury *after* trial," regarding their reasons for the verdict. (Emphasis supplied).

---

522 So.2d 567 (La.1988), the defendant was charged with second degree murder and convicted of manslaughter although the evidence that he shot the inebriated victim in the back of the head was not sufficient evidence of any sudden passion, provocation or heat of blood. Upholding the conviction for manslaughter, this court stated:

> The responsive verdict of manslaughter in this case operated as a compromise between guilty of second degree murder and not guilty. It was unanimously given. The jury may return any legislatively provided responsive verdict, as long as the evidence was sufficient to support a conviction of the charged offense. *State ex rel., Elaire v. Blackburn*, 424 So.2d 246, 249 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). The evidence produced in this case--one shotgun blast at close range to the back of the victim's head--was sufficient to support a conviction of second degree murder. The verdict of manslaughter simply reflected the jury's right to compromise between the verdicts of guilty of second degree murder and not guilty. The responsive verdict statute was designed to afford jurors this choice. . . .

3

Ordinarily, a reviewing court does not scrutinize the thought processes employed by jurors in reaching a verdict. *See State v. Marshall*, 04-3139 (La. 11/29/06), 943 So.2d 362, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007). The mental processes of a juror are insusceptible of appropriate legal inquiry. La.Code Evid. art. 606(B). The trial judge's observations, though well-intended, were an indirect breach of this evidentiary rule. Hence, any reference to these comments to vitiate an otherwise valid conviction was error.

For the foregoing reasons, I respectfully dissent in part.