PER CURIAM.
liFor the following reasons, we grant the state’s application, reverse the decision of the court of appeal, and reinstate defendant’s conviction and sentence for attempted simple burglary in violation of La.R.S. 14:27 and 14:62.
The state charged defendant with second degree murder in violation of La.R.S. 14:30.1(A)(1), and attempted simple burglary, following an incident on the night of January 24, 2007, in which the victim, an off-duty deputy with the Calcasieu Parish Sheriffs Office, was shot several times and killed while investigating a burglary in progress at Mudd Fashions on Ryan Street in Lake Charles. After trial by jury, during which two other participants in the attempted break-in testified for the state, defendant was convicted of manslaughter *225 and attempted simple burglary. The trial court sentenced him to concurrent terms of 40 years’ imprisonment at hard labor for manslaughter and to six years’ imprisonment at hard labor for attempted simple burglary. On appeal, defendant |2argued, among other assignments of error, that his multiple convictions subjected him to double jeopardy in violation of this Court’s settled rule that even in a single proceeding, the state may not convict and sentence a defendant for felony murder/manslaughter and the underlying felony offense. See, e.g., State ex rel. Adams v. Butler, 558 So.2d 552 (La.1990). On the basis of remarks made by jurors to the trial judge at the close of the proceedings, explaining how they reached a verdict on the lesser included and responsive offense of manslaughter, the Third Circuit affirmed defendant’s conviction and sentence for manslaughter but vacated his conviction and sentence for attempted simple burglary. State v. Pegues, 09-1089 (La.App. 3d Cir. 6/9/10), 43 So.3d 1008 (Thibodeaux, C.J., dissenting in part and assigning reasons).
The state charged defendant with a specific intent homicide in violation of La.R.S. 14:30.1(A)(1) because simple burglary (or its attempt) is not one of the enumerated felonies in La.R.S. 14:30.1(A)(2), defining the offense of second degree felony murder. The case therefore went to the jury as a specific intent homicide. However, in its general charge to jurors, after instructing them that a verdict of guilty as charged required a finding that defendant killed the victim and that he acted with the specific intent to kill or to inflict great bodily harm, the trial court turned to the responsive verdicts to second degree murder and gave jurors the definitions of manslaughter in La.R.S. 14:31(A)(l)(provoca-tion and heat of blood reducing a homicide that would otherwise constitute first or second degree murder), and in La.R.S. 14:31(A)(2), ie., a homicide committed without a specific intent to kill when the offender is engaged in any felony not otherwise enumerated in the felony murder provisions of first and second degree murder. The court specifically informed jurors that they could find defendant guilty of manslaughter |sif they found either that defendant killed the victim and acted with the specific intent to kill or to inflict great bodily harm in the heat of passion or that the victim ivas killed when the offender was engaged in the perpetration or attempted perpetration of certain offenses, including attempted simple burglary. The charge, with its shift from active to passive voice, thus gave jurors the option of finding the defendant guilty of a homicide, ie., felony manslaughter, even if they failed to agree he fired the fatal shots that killed the officer. The jury returned its verdict of manslaughter without indicating whether they found defendant guilty of the offense defined by La.R.S. 14:31(A)(1) or La.R.S. 14:31(A)(2)(a).
It appears from the trial court’s remarks at sentencing that the judge spoke with one of more jurors following return of the manslaughter verdict. The court apparently conducted the interview because of its firm opinion, stated on the record at sentencing, that the state had proved defendant guilty of second degree murder because it proved he fired the fatal shots. The court thus sought some understanding of what led jurors to the lesser verdict. According to the court’s summary of the interview, jurors informed the judge that they had entertained some doubt that defendant, as opposed to one of the co-participants in the attempted break-in who had testified at trial for the state, had, in fact, fired the fatal shots. “ ‘So you were convicted of manslaughter,’ ” the court informed defendant before it imposed the maximum sentence of 40 years’ imprisonment at hard labor on the manslaughter *226 count, “ ‘based on the fact that since they didn’t feel certain that it was necessarily you, but because you were involved in ... the attempted burglary, and that [the deputy] was murdered in the process of the commission of that crime that you were convicted of manslaughter.’ ” Pegues, 09-1089 at 16, 43 So.3d at 1018.
14For the trial judge, all the jurors’ remarks during the post-verdict interview meant was that defense counsel “‘did a very good job of muddying the water a little bit....’ ” Id. However, for the court of appeal, the jurors’ remarks meant that, rather than “determin[ing] on our own, from the facts presented during trial, whether the jury relied on a basis other than the underlying felony to arrive at a verdict,” the court could determine as a matter of fact that defendant had been convicted of felony manslaughter and the underlying felony offense of attempted simple burglary, and that defendant therefore had been punished twice for the same conduct. Pegues, 09-1089 at 13-14, 43 So.3d at 1017. The court of appeal accordingly vacated defendant’s sentence for attempted simple burglary, the less severely punishable and punished of the two crimes. Id.
Dissenting from that portion of the majority opinion, Chief Judge Thibodeaux agreed with the majority that “[c]learly ... if the attempted simple burglary was the only basis for the manslaughter conviction, there would be a double jeopardy violation.” Pegues, 09-1089 at 1, 43 So.3d at 1022 (Thibodeaux, C.J., dissenting in part). However, in his view, the state presented sufficient evidence “to support the compromise verdict of manslaughter based on specific intent to kill.” Id. (footnote omitted). Chief Judge Thibodeaux further remarked that “[o]rdinarily, a reviewing court does not scrutinize the thought processes employed by jurors in reaching a verdict,” because, as a general rule, “[t]he mental processes of a juror are insusceptible of appropriate legal inquiry.” Id., 09-1089 at 4, 43 So.3d at 1022 (Thibo-deaux, C.J., dissenting in part)(citing La. C.E. art. 606(B)). To the extent that the trial court’s observations “though well-intended, were an indirect breach of this evidentiary rule,” Chief Judge Thibodeaux [ ¿observed that “any reference to these comments to vitiate an otherwise valid conviction was error.” Id.
We agree with Chief Judge Thi-bodeaux that the majority on the court of appeal panel erred in seizing on the jurors’ remarks during the informal interview with the trial judge as a basis for invalidating the verdict for attempted simple burglary. By deliberate choice, Louisiana does not provide jurors with special verdicts by which they may reveal at least some of the underlying thought processes leading to a verdict. See State v. Beavers, 364 So.2d 1004, 1009 (La.1978)(discussing why “[tjhere is no authority in our law for special verdicts in criminal cases” and why “[sjpecial verdicts are not favored in criminal cases because of their restrictive effects upon the jury.”). La.C.Cr.P. art. 817 enforces the system of general verdicts in the criminal law of Louisiana by providing that “[a]ny qualification of or addition to a verdict of guilty, beyond a specification of the offense as to which the verdict is found, is without effect upon the finding.” Although the language “specification of the offense” might encompass identifying which alternative definition of an offense the jurors actually found, in the present case, La.C.Cr.P. art. 814(3) maintained the verdicts for second degree murder at the most general level, i.e., guilty, guilty of manslaughter, guilty of negligent homicide, and not guilty. Moreover, as Chief Judge Thibodeaux emphasized in his dissent, in Louisiana as elsewhere, a juror generally *227 may not testify as to the mental processes by which he arrived at his or her verdict as a basis for attacking the validity of that verdict. La.C.E. art. 606(B)(“Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or | f,dissent from the verdict or indictment or concerning his mental processes in connection therewith[.]”).
The statutory rules in La.C.Cr.P. art. 817 and La.C.E. art. 606(B) combine to form a jury shield law which serves important institutional goals. In Tanner v. United States, 488 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Supreme Court traced Fed.R.Evid. 606(b), progenitor of La.C.E. art. 606(B), back to its origins in the common law and found that nothing in the rule appeared inconsistent with the Sixth Amendment guarantee of a fair and impartial jury. The Court observed that “[sjubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict.... The Court’s holdings requiring an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations do not detract from, but rather harmonize with, the weighty government interest in insulating the jury’s deliberative process.” Tanner, 483 U.S. at 119-20, 107 S.Ct. at 2747; see also Fed.R.Evid. 606(b), Advisory Committee Notes (“Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process.”).
In the present case, the trial judge clearly was not intent on impeaching the verdicts returned by the jury by inquiring into their validity when he spoke informally to jurors at the close of the case to satisfy himself why jurors had returned a verdict he thought inadequately described the conduct of defendant proved by the state at trial. The indirect circumvention of La.C.E. art. 606(B) was not by the trial court but by the majority on the court of appeal when it seized on 17his summary of the jury interview at sentencing as a basis for invalidating the verdict of attempted simple burglary on double jeopardy grounds. The preclusion rule of La.C.E. art. 606(B) would have prevented defense counsel from haling jurors back into court for the same purpose, and not the least of the problems in taking into account a subjective analysis of the verdicts rendered in the present case is that the trial judge’s summary of the interview does not clearly indicate whether the juror or jurors communicated their personal thought processes in agreeing to the verdicts or whether they conveyed the consensus of the jury as a whole. It remains entirely possible that several jurors thought the state had proved its case of second degree murder because the evidence established beyond a reasonable doubt that defendant fired the fatal shots but exercised their plenary discretion to compromise their verdict, if for no other reason than to reach a verdict in the case, without compromising their belief that defendant had shot and killed the victim, i.e., that they could agree to a verdict of manslaughter under the definition of the offense provided by La.R.S. 14:31(A)(1) and the trial court’s general charge, even as other jurors, unpersuaded by the state’s evidence that defendant personally fired the fatal shots, agreed to a manslaughter verdict on the basis of the felony-murder definition of the offense in *228 La.R.S. 14:31(A)(2). No constitutional rule forbids a state from combining into a single crime alternative definitions of murder as a premeditated homicide or a homicide during commission of an underlying felony offense, or jurors from reaching one general verdict based on any combination of alternative findings. See Schad v. Arizona, 501 U.S. 624, 631-32, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991)(Souter, J.)(“We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission.... In |8these cases, as in litigation generally, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line.”)(internal quotation marks and citation omitted).
Thus, as Chief Judge Thibodeaux noted in his dissent, the trial judge’s summary of his informal meeting with the jurors did not necessarily reflect the jury’s overall judgment that the state had failed to prove defendant fired the shots which killed the deputy and that they did not take alternate routes to the same end according to individual juror’s perceptions of what the state did or did not prove at trial. To the extent that Louisiana’s system of general verdicts provides a jury with that discretion, and otherwise generally precludes a juror from explaining his thought processes as a basis for challenging the validity of his verdict, the double jeopardy analysis in cases such as the present one necessarily proceeds on the same purely objective level that a due process inquiry into the sufficiency of the evidence supporting the verdicts also takes place. Jackson v. Virginia, 443 U.S. 307, 319 n. 13, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)(“Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder — if known.”). The analysis begins and ends with the question of whether a rational trier of fact could have returned a verdict for the charged offense of second degree murder, defined solely as a specific intent homicide, and thus could have grounded its lesser verdict for manslaughter on a finding other than commission of an underlying felony offense, ie., on a finding that defendant shot the victim with the specific intent to kill or to inflict great bodily harm.
|nThe trial judge clearly thought so, in part because DNA analysis of a swab taken from the murder weapon discarded near the scene excluded all of the other participants but defendant. While the sufficiency of the evidence was not raised on appeal, Chief Judge Thibodeaux summarized the other evidence in the state’s case as follows:
The investigation indicated Deputy In-zer was standing still while smoking a cigarette when he was first shot, and he was shot at least three more times, with two fatal wounds to the chest. The deputy’s gun, which was loaded, was found in its holster inside his left boot. Elmer Franklin testified that while he was running he heard a gunshot, he looked around, and saw Mr. Pegues ‘right there standing up and a man that fell, like, on the ground.’
We agree with the dissent that on this evidence, “the record supports sufficient evidence to base the manslaughter conviction on specific intent to kill,” and thus, given the general verdict returned for manslaughter, “there was no double jeopardy violation.” Pegues, 09-1089, p. 3, 43 So.3d at 1022 (Thibodeaux, C.J., dissenting in part). We therefore reverse the decision of the court of appeal to the extent that it vacated defendant’s conviction of attempted simple burglary and his concur *229 rent sentence of six years’ imprisonment at hard labor, and reinstate the conviction and sentence.
REVERSED IN PART; DEFENDANT’S CONVICTION AND SENTENCE FOR ATTEMPTED SIMPLE BURGLARY REINSTATED.