STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-933

STATE OF LOUISIANA

VERSUS

TERRY L. CLARKSON

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-974-07
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese,
Judges.

**AFFIRMED.**

**David W. Burton**
**District Attorney - 36th Judicial District**
**Richard Alan Morton**
**Assistant District Attorney**
**P. O. Box 99**
**DeRidder, LA 70634**
**(337) 463-5578**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Terry L. Clarkson**

**David L. Wallace**
**Attorney at Law**
**P. O. Box 489**
**DeRidder, LA 70634**
**(337) 462-0473**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Terry L. Clarkson**

**Terry L. Clarkson**
**Camp D Falcon #1**
**Louisiana State Prison**
**Angola, LA 70712**
      **Pro Se**

**PICKETT, Judge.**

## FACTS

In 2001, John "Jack" Mayeux moved to Ragley to live on forty acres of land he had purchased a few years earlier. Mr. Mayeux was a collector of "lots of things" that he sold to people. By 2007, he "wanted to downsize," and he planned to sell his property.

Mr. Mayeux began an estate sale that started the first week of October, 2007. When Richard Young first learned of the sale, he talked to Mr. Mayeux about helping him, and he introduced the defendant, Terry L. Clarkson, to him. Mr. Young planned to get scrap iron from Mr. Mayeux and sell it. Mr. Young knew the defendant through Margretta Yellott. He described the defendant as Ms. Yellott's boyfriend. The defendant had lived in Ms. Yellott's home with her, but at some point he moved into one of the travel trailers in her yard. Mr. Young also knew D.B.[1] through frequently seeing him at the Yellott residence. The property of Ms. Yellott and Mr. Mayeux was roughly a fifteen-minute drive apart. The defendant and James Ramsdell, Ms. Yellott's son, were also helping Mr. Mayeux "get things together or move fences, cattle around," according to Diana Landry Huddle, a former girlfriend of Mr. Mayeux.

D.B. stayed with Ramsdell on a regular basis, sometimes as long as a couple of weeks. He testified the defendant had a trailer in Westlake and traveled by means of a bicycle. D.B. met Mr. Mayeux through the estate sale. Both Ramsdell and the defendant were at the sale the first time D.B. went there.

---

[1]In accordance with Uniform Rules—Courts of Appeal, Rule 5–2, initials are used to "ensure the confidentiality of a minor who is a party to or whose interests are the subject matter in the proceeding[s]." D.B. was a minor at the time of the offense.

According to D.B's testimony, the night before the murder, Ramsdell, D.B., and the defendant met at Ramsdell's trailer and talked about taking Mr. Mayeux's things. The three went to Mr. Mayeux's home that night to kill him. Ramsdell said they would use a request for candles as an excuse to go. The plan was for the defendant to hit Mr. Mayeux in the head with a hammer and kill him. The three went to Mr. Mayeux's home, and Ramsdell and the defendant went to Mr. Mayeux's back door while D.B. stayed in the car. After fifteen or twenty minutes they returned to the car, and Ramsdell said the defendant "chickened out." The defendant said Mr. Mayeux "would never turn away from him, that he couldn't hit him." D.B. said he did not believe anyone was serious about killing Mr. Mayeux, and when nothing happened that night, his thoughts were confirmed.

When D.B. awoke on October 9, 2007, the morning of the murder, Ramsdell and the defendant were talking over coffee, saying they "need to go back and do what [they were] going to do." Ramsdell thought they could wait until Mr. Young left to kill Mr. Mayeux. Ramsdell said "he wanted his stuff," and the defendant said "he was okay with it." Ramsdell "said he'd stab [Mr. Mayeux] with this knife, and then he said it would be too bloody. Then he pulled out his pistol from his drawer and said he'd just shoot him." "Besides [the defendant] saying he was good," neither D.B. nor the defendant said anything about the plan. They left for Mr. Mayeux's property twenty to thirty minutes later.

Also on that morning, Mr. Young went to Mr. Mayeux's property to load some scrap iron. The defendant, Ramsdell, and D.B. arrived in Ms. Yellott's car and worked with Mr. Mayeux and Mr. Young for about an hour. They were still there when Mr. Young left around 9:00 or 9:30 that morning. At first, the

defendant said he would go with Mr. Young to help him, but Ramsdell said no, they had to go to work. The defendant stayed.

According to D.B., Mr. Mayeux said he had to go to the store, and Ramsdell asked the defendant "to go distract him with some tools." The defendant walked to where Mr. Mayeux stood at the corner of the barn, and Ramsdell joined them. D.B. got out and stood behind the tractor about forty or fifty feet away, knowing what was about to happen. Ramsdell "pulled out his gun and started shooting." Ramsdell shot Mr. Mayeux six or seven times in the chest and the back of the head. Mr. Mayeux was eight to ten feet from Ramsdell when he was first shot, and the defendant was five to ten feet from Ramsdell. D.B. thought the defendant "was walking away when [Ramsdell] was shooting." D.B. saw the defendant do nothing to try to stop Ramsdell.

D.B. heard the "[f]irst couple of shots," and Mr. Mayeux fell to the ground. Mr. Mayeux fell on his stomach and tried to crawl away from Ramsdell. Ramsdell gave the gun to the defendant to put in the car, but he saw Mr. Mayeux "was still crawling." He ran to the defendant and got the gun from him, then returned to Mr. Mayeux and shot him twice in the back of the head while standing "[r]ight over him." Mr. Mayeux did not move after that.

D.B. did not know where the defendant was standing when Ramsdell shot Mr. Mayeux in the head. Later, D.B. saw Mr. Mayeux's body wrapped in a tarp. Ramsdell returned the gun to the car, where he normally kept it in a pocket of the driver's door. At Ramsdell's instruction, D.B. ran to shut one of the gates providing entry to the property. When he returned, he saw Ramsdell on Mr. Mayeux's four-wheeler, driving it out of the barn. After the shooting, Ramsdell told D.B. to go inside Mr. Mayeux's trailer, and he, Ramsdell, and the defendant

3

went inside "[t]o get stuff." D.B. said he was afraid of Ramsdell, who threatened twice to kill him and the defendant.

In Mr. Mayeux's bedroom, they found rolls or jars of quarters scattered beside the bed. D.B. put them in a box while Ramsdell and the defendant dug through the dressers and the bathroom. Ramsdell took two pistols from Mr. Mayeux's bedroom and put them in the box with the quarters. Ramsdell and the defendant also took six or seven rifles and shotguns from Mr. Mayeux's bedroom and put them in the car. Ramsdell said he would kill them if they told, both before and after the shooting.

Ramsdell backed Mr. Mayeux's truck into the barn, and he, the defendant, and D.B. "started loading stuff" into it. They took a blowtorch that "had two big bottles and a little cart" and a generator. When they left, Ramsdell drove Mr. Mayeux's truck, the defendant drove the car, and D.B. drove the four-wheeler to Ms. Yellot's house. They put the guns, pistols, and quarters in Ramsdell's room and the other things "[i]n the shop in the back." After everything was unloaded, Ramsdell drove Mr. Mayeux's truck to his house, and the defendant drove Ms. Yellott's car. They returned to Ms. Yellott's property about ten or fifteen minutes later in the car. D.B. helped them unload a welder, a chainsaw, and a box of welding rods from the car.

D.B. and Ramsdell buried the murder weapon in Ramsdell's back yard "[i]n the beginning of the woods." At Ramsdell's instruction, all of their clothes were burned in a pile in Ramsdell's back yard. D.B. believed Ramsdell also took $190 from Mr. Mayeux's wallet. The three of them split up all the quarters taken from Mr. Mayeux's property. D.B. and the defendant each got about $100. Ramsdell and the defendant carried guns out of Mr. Mayeux's home the day of the murder.

4

Ramsdell suggested they come up with a story that they were supposed to go to Toledo Bend and help someone build something on the day of the murder. D.B. believed they also agreed to some kind of story about the murder, but he could not recall what it was. Ramsdell told D.B. and the defendant he would kill them if they told anyone.

After the trio completed unloading the items they took from Mr. Mayeux's property, burned their clothes, and counted the money, the defendant rode his bicycle to Westlake. D.B. did not talk to him after that.

Mr. Young had planned to return to Mr. Mayeux's property that evening, but he "got lazy" and did not go. He tried to contact Mr. Mayeux that evening but was unable to reach him by telephone. The next day, Mr. Young called and went to Mr. Mayeux's property. The phone was not answered, and the gate to the property was closed. The gate was still closed when Mr. Young checked on Thursday morning, and he went home.

Gloria Mouton and her husband had also met Mr. Mayeux and the defendant through the sale. The Moutons purchased a tractor, but Mr. Mayeux asked them to leave it for a few days so he could use it "to move some stuff." The next Thursday, October 11, 2007, the Moutons tried to contact Mr. Mayeux, but they were unable to reach him. They went to Mr. Mayeux's property and drove around to the back. They parked near the garage and began calling and looking for Mr. Mayeux. They noticed a foul odor.

Mr. Mayeux's truck was present, and the door to his house was ajar. When Ms. Mouton pushed the door open and stepped into the kitchen, it "was a shambles. Cabinet doors were open, drawers were open; and it looked like somebody had been rummaging through there." She left the house and returned to

5

her vehicle, where she kept a telephone book. She had previously met Mr. Young, and she called him. Mr. Young came and discovered Mr. Mayeux's body when he picked up a corner of a blue canvas tarp near the barn.

Estelle Biven, Mr. Mayeux's daughter, went through the house and barn on October 11, 2007, and accumulated a list of items missing from her father's property. Those items included "[s]everal different types of guns, long guns, rifles, shotguns, scopes, air compressors, acetylene-oxygen tanks with rack, several pneumatic tools, four-wheeler, four-wheeler ramps."

Ms. Biven identified from photographs items recovered from the Yellott property that had belonged to her father. Those items included more guns, a scope, a black cowboy hat, ammunition, a cutting torch, gauges, hoses, bottles, a bottle rack, a chainsaw, a jigsaw, an impact wrench, and a tool box. She testified Mr. Mayeux normally kept the long guns in an unlocked cabinet in his bedroom.

Mr. Young had seen cash and checks given to Mr. Mayeux during the sale. He said Mr. Mayeux would put the money "[i]n a little bag in a drawer in a desk in the barn." Ms. Bivens' husband found $32,000 in a bank bag in a crock pot in the utility room of Mr. Mayeux's home after his death.

Shannon Burgess was one of the first sheriff's detectives at the scene. Mr. Young told him Ramsdell, D.B., and the defendant were present the last time he was there. Detective Burgess went to the Yellott property and spoke to D.B. and Ramsdell, who said they had last seen Mr. Mayeux a few days before, and he was fine when they left. They said they had been working at Toledo Bend, and the defendant had gone to Westlake on his bicycle.

Detective Burgess contacted the defendant at a trailer in Westlake on October 11, 2007. The defendant seemed surprised to learn Mr. Mayeux had been

6

murdered, and he agreed to give a statement at the Westlake Police Department. The defendant "acted completely cooperative" and forthcoming, "[r]eal cut and dry." He denied knowledge and involvement with the murder. After guns and other items were found at the Yellott property, Detective Burgess returned to Westlake, and the defendant agreed to talk to them further. He gave a second statement in Westlake on October 16, 2007. When the defendant indicated he may have some knowledge about the murder, Detective Burgess asked him to go to the DeRidder sheriff's office for a recorded interview. The defendant was arrested and charged on October 16, 2007, after giving that statement.

In the October 11 statement, the defendant said he, Ramsdell, and D.B. left Mr. Mayeux's property after Richard Young, and he then rode his bicycle to Westlake. He said Mr. Mayeux was fine when he left. In the October 16 statement, the defendant said he, Ramsdell, and D.B. met Mr. Young to load "that iron stuff." The defendant said he turned around and heard a gunshot. He did not see Ramsdell make that shot, but he did see him shoot Mr. Mayeux a second time. He heard four or five shots while he was walking toward the car on the side of the barn. The defendant picked up one of the shells ejected from the gun at Ramsdell's instruction but with no threats. Ramsdell covered the body. It seemed to the defendant that Ramsdell had mentioned something about killing Mr. Mayeux on the previous Saturday, but the defendant said he thought nothing of it; he "blew that off."

The defendant stated that after the shooting, Ramsdell "loaded some stuff up in the car." D.B. took the four-wheeler to Ramsdell's home. The defendant kept telling them they had to go, and he thought Ramsdell might try to kill him. The defendant drove Ms. Yellott's car to her house after Ramsdell put stolen rifles and

7

shotguns in it. He saw Ramsdell bury the murder weapon in the woods behind his house, and he saw the four-wheeler parked behind the house. Ramsdell "said to tell the cops that [they] left between 10:30 and a quarter to eleven."

The defendant said he lied in his first statement because he was scared. Although the defendant admitted going to Mr. Mayeux's home the night before the murder to get some candles, he first denied any plan to harm Mr. Mayeux. However, he then said Ramsdell "did mention something about he wanted [the defendant] to do something," "wanted [him] to hit [Mr. Mayeux] in the back of the head with a hammer or something." Ramsdell would then "break his neck and do whatever, something," but the defendant said he "couldn't do that." That plan was discussed on the way over to Mr. Mayeux's home. Although the defendant said he was scared of Ramsdell after the shooting, he said Ramsdell never threatened him "in a, uh, verbal sense but you could see in his face."

In the statement taken in DeRidder, the defendant confirmed his story and said there was no discussion of harming Mr. Mayeux on the way to his house on the day of the murder. The defendant said he never saw Ramsdell get the gun.

The defendant was indicted on November 26, 2007, for the first degree murder of John H. Mayeux, a violation of La.R.S. 14:30. The indictment also charged the defendant with criminal conspiracy to commit first degree murder, a violation of La.R.S. 14:26 and La.R.S. 14:30; armed robbery, a violation of La.R.S. 14:64; aggravated burglary, a violation of La.R.S. 14:60; theft of firearms, a violation of La.R.S. 14:67.15; and theft of movable property having a value of more than $500, a violation of La.R.S. 14:67. The defendant pled not guilty to each charge.

On March 3, 2010, the defendant filed a motion to quash the indictment on grounds the state failed to bring him to trial within two years. The defendant further alleged the charges of armed robbery and aggravated burglary should be dismissed on grounds of double jeopardy. The trial court denied the motion on March 5, 2010. In response to the defendant's writ application, this court held:

> **WRIT DENIED, IN PART; WRIT GRANTED AND MADE PEREMPTORY, IN PART:** There is no error in the trial court's ruling. The first degree murder offense remained a capital offense for the purpose of the three-year time limitation in which to bring Defendant to trial. However, the two-year time limitation in which to take Defendant to trial on the non-capital offenses commenced running on November 26, 2007, and tolled on November 26, 2009, and the State failed to present any evidence at the motion to quash hearing that the prescription had not yet run, or that there were interruptions or suspensions. *See State v. Jones*, 34,542, 34,543 (La.App. 2 Cir. 2/28/01), 780 So.2d 1234, *writ denied*, 01-2820 (La. 8/16/02), 822 So.2d 613.

*State v. Clarkson*, an unpublished writ decision bearing docket number 10-403 (La.App. 3 Cir. 6/11/10). The Louisiana Supreme Court vacated this court's ruling in part "to the extent that [this court] determined that the non-capital offenses charged in the grand jury indictment had prescribed as a matter of La.C.Cr.P. art. 578(A)(2)." *State v. Clarkson*, 10-1625, p. 1 (La. 10/29/10), 48 So.3d 272, 273. The supreme court held "the [S]tate's election to forego capital punishment" properly joined all the charges, which were all "subject to the three-year time limit" for bringing the defendant to trial. *Id.*

The defendant filed a motion to require a unanimous verdict on February 22, 2011, the first day of trial, based on the supreme court's treatment of this matter as a capital case. The trial court denied this motion on February 25, 2011. The defendant and the state exercised all of their peremptory challenges. The trial court excused five jurors for cause.

9

The jury found the defendant guilty of second degree murder as a responsive verdict to the first degree murder charge. It found him not guilty of conspiracy to commit first degree murder and guilty as charged of armed robbery, aggravated burglary, theft of firearms, and theft of property valued at more than $500. None of the verdicts were unanimous.

The defendant filed motions for new trial and for post-verdict judgment of acquittal on April 26, 2011. Those motions were denied on April 27, 2011. The defendant filed a motion to reconsider his sentence on May 17, 2011. It was denied without hearing on May 18, 2011.

The trial court found the defendant was a principal to the murder and imposed the mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence, even though he "was not the shooter." On the charge of armed robbery, the trial court sentenced the defendant to ninety-nine years at hard labor without benefit of parole, probation, or suspension of sentence. The defendant was also sentenced to thirty years at hard labor for aggravated burglary; ten years at hard labor without benefit of parole, probation, or suspension of sentence, along with a $1,000 fine, for theft of firearms; and ten years at hard labor for theft of movable property over $500. The trial judge imposed the sentences to run concurrently.

The defendant now appeals his conviction and sentence.

## ASSIGNMENTS OF ERROR

1) The trial court erred in denying the Motion for Post-Verdict Judgment of Acquittal as the evidence was insufficient to support the jury's verdict. Terry Clarkson was not a willing participant to any of the crimes alleged in the Bill of Indictment.

2) Terry Clarkson's constitutional guarantee against double jeopardy was violated as he received multiple punishments for a single criminal act.

3) The trial judge erred in failing to grant a mistrial following an outburst by the daughter of the deceased during cross-examination. This outburst denied Terry Clarkson of his right to a fair trial.

4) Terry Clarkson was denied constitutional rights guaranteed to him under both the Equal Protection Clauses and the Due Process Clauses of the Constitutions of the United States and of the State of Louisiana by a series of rulings both before and during the trial of this case.

A) The Motion to Quash filed on behalf of Appellant asserting that the prosecution had failed to bring him to trial within the time limitations set forth in the Code of Criminal Procedure was erroneously denied.

1) The trial court, the Third Circuit Court of Appeal and the Louisiana Supreme Court erred in concluding that Terry Clarkson's case was a "capital" case for purposes of determining the time limitations within which the State was required to bring Mr. Clarkson to trial.

2) The courts erred in concluding that the three year time limitations for trial set forth in La. Code Crim. P. art. 578(A)(2) were applicable in this case instead of the two year time limitations set forth in La. Code Crim. P. art. 578(A)(1).

B) Having concluded that this case was "capital," the trial court erred in denying Appellant's Motion to Require a Unanimous Verdict.

1) In the event this court upholds the pre-trial rulings that this case was a "capital case," the trial court erred in concluding that Terry Clarkson's case was a "non-capital case" for trial purposes.

2) The trial court erred in concluding that Appellant was not entitled to the guarantees provided to a defendant charged with a "capital offense," especially the right to a unanimous verdict as guaranteed by the Sixth Amendment of the United States Constitution.

3) The trial court erred in not declaring La. Code Crim. P. art. 782 unconstitutional, as it fails to guarantee a defendant the right to a unanimous verdict.

11

4) La. Const. art. I, § 17(A) is likewise unconstitutional, as it fails to guarantee a defendant the right to a unanimous verdict.

C) The trial court erred in dismissing jurors for cause which resulted in the State receiving, in essence, three additional peremptory challenges, and thus, denying Terry Clarkson a fair trial.

1) The trial court erred in granting the State's requested challenges for cause of prospective jurors Gatson and Chavis.

2) The trial court erred in releasing juror Andrus after he had been sworn as a juror in this case, in essence granting a challenge for cause as to this juror.

D) The trial court erred in rejecting the Batson challenges raised by Appellant as to the removal of prospective jurors Gatson and Chavis.

5) The trial court erred in denying Terry Clarkson's Motion for New Trial as he was denied a fair trial. The rule of sequestration was rendered meaningless because a news reporter provided a "real-time" blog of the court proceedings and no expanded sequestration instruction had been given to the witnesses to avoid news accounts of the case.

6) The trial court erred in depriving Appellant the opportunity to present impeachment evidence against the State's main witness, D.B.[]

### *Pro Se* Assignments of Error

1) The trial court erred in denying the motion for grand jury transcript.

2) The trial court erred in denying the motion to vacate and dismiss the charges.

### **ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends the trial court erred in denying his motion for post-verdict judgment of acquittal because the evidence was insufficient to support the jury's verdicts. Whether such a motion should be granted is a question of legal sufficiency. La.Code Crim.P. art. 821(B); *State v. Westmoreland*, 10-1408 (La.App. 3 Cir. 5/4/11), 63 So.3d 373, *writ denied*, 11-1660 (La. 1/20/12), ___ So.3d ___.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact[,]" but rather, it should defer to the rational credibility and evidentiary determinations of the jury.

*Id.* at 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 [(2010)] (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

The defendant was convicted of five separate crimes. The main witness against the defendant was D.B. On appeal, the defendant challenges D.B.'s testimony and claims it is not credible.

*Second degree murder*

The defendant was convicted of second degree murder as a principal, one who is "concerned in the commission of a crime, whether . . . [he] directly commit[s] the act constituting the offense, aid[s] and abet[s] in its commission, or directly or indirectly counsel[s] or procure[s] another to commit the crime[.]" La.R.S. 14:24.

> Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2) When the offender is engaged in the perpetration or attempted

14

> perpetration of . . . aggravated burglary [or] . . . armed robbery . . . even though he has no intent to kill or to inflict great bodily harm.

La.R.S. 14:30.1(A).

By the defendant's own statements, he "blew off" a discussion about killing Mr. Mayeux the night before the actual murder. Ramsdell wanted the defendant "to hit [Mr. Mayeux] in the back of the head with a hammer or something" so that Ramsdell would then "break his neck and do whatever, something." Although the defendant indicated he would "do nothing like that," he also did nothing to extricate himself from the situation or report Ramsdell's plans. He just "blew it off."

The defendant heard the first gunshot Ramsdell fired and saw him take the second shot. Although the defendant said he "freaked out" after hearing the first shot, he made no effort to help Mr. Mayeux. Rather, he simply walked "back toward the car, right there by the, on the side of the barn." He did not know if Mr. Mayeux was dead. The defendant urged the others to leave, saying, "Look, man. We gotta go, we gotta get out of here." He voluntarily picked up one of the expended shells and drove Ms. Yellott's car to her house, loaded with Mr. Mayeux's possessions. He watched Ramsdell bury the murder weapon. Then he left town without reporting any of the crimes. All the while, the defendant considered Mr. Mayeux "a good man" who had helped him.

Two days after these events, the defendant lied to investigators and told them Mr. Mayeux was fine when they left. Only on October 16, a full week after the murder, did the defendant admit to knowledge of the murder and then only when confronted with the evidence against him. The defendant made no voluntary attempt to inform authorities of the murder or aid in Ramsdell's apprehension.

15

The defendant argues he acted out of fear for his own life. He admitted Ramsdell never verbally threatened him. The defendant stated he could just see threats in Ramsdell's face. The defendant was surely freed from any power Ramsdell may have had over him once he left and went to Westlake. Nevertheless, he made no effort in Westlake to report the crimes or provide any information on those involved until he, himself, was caught.

The trial judge made these comments at the defendant's sentencing hearing:

> I cannot say with absolute certainty that this offense would have occurred had it not been for your association with Mr. Ramsdell. Nevertheless, you had the moral obligation to not let Mr. Ramsdell take you down this path. And you did not do anything whatsoever, even though you had numerous opportunities to change the outcome of these tragic circumstances; and you chose not to. And for that, I can only describe you as a willing participant in these events.

The trial judge was correct. The defendant could have left Ramsdell on the night before the murder when Ramsdell discussed killing Mr. Mayeux. He could have refused to go to Mr. Mayeux's home that night. He could have tried to dissuade Ramsdell from his plan. Instead, he "blew it off." At the murder scene, the defendant could have tried to aid Mr. Mayeux. At the very least, he could have notified authorities after he left Ramsdell. Instead, he went on with his life with no further thought to the murder. These acts constitute aiding or abetting in the commission of Mr. Mayeux's murder or "directly or indirectly counsel[ing] or procur[ing] another to commit" the murder; thus, the defendant's actions satisfy the elements of being a principal to the crime of second degree murder. La.R.S. 14:24, *see also* La.R.S. 14:30.1.

16

*Armed robbery, aggravated burglary, theft of firearms, and theft of movable property over $500*

In Ramsdell's case, this court found "'Louisiana jurisprudence does not distinguish between the armed robbery which occurs before the killing of the victim and the robbery of the victim whom the defendant has already killed.'" *State v. Ramsdell*, 09-1510, p. 9 (La.App. 3 Cir. 10/6/10), 47 So.3d 78, 84 (quoting *State v. Goodley*, 01-77, p. 10 (La. 6/21/02), 820 So.2d 478, 484). This court determined "Mr. Mayeaux's [sic] murder facilitated the robbery and burglary." *Id.* Based on D.B.'s testimony, this court found Ramsdell "desired to kill Mr. Mayeaux [sic] to effectuate a taking of his belongings . . . there was no significant break in the chain of events between the time the shots were fired and the men left Mr. Mayeaux's [sic] property." *Id.*

The defendant is found to be a principal to these crimes for the same reasons he is found to be a principal to second degree murder. His knowledge of the plans to commit these crimes can be established solely on the evidence provided by the defendant in his statements to police. It only becomes stronger with D.B.'s testimony about plans to rob Mr. Mayeux. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant argues he was subjected to double jeopardy through convictions and sentences for second degree murder, armed robbery, and aggravated burglary. He claims he received multiple punishments for a single criminal act. Ramsdell also made this argument on appeal.

The defendant, however, contends his case is distinguishable from Ramsdell's because Ramsdell's conviction for first degree murder required the specific intent to kill *and* a death during the engagement in one of the offenses

17

enumerated in La.R.S. 14:30. The defendant's conviction for being a principal to second degree murder, however, required *either* a finding of the specific intent to kill *or* a death during the engagement in an enumerated offense. *See* La.R.S. 14:30.1. The jury found the defendant guilty of two enumerated offenses in addition to the responsive verdict of guilty of second degree murder when he was charged with first degree murder. The defendant argues this means the jury's responsive verdict indicates its finding that he did not have the specific intent to kill or commit great bodily harm but instead killed during an enumerated offense. Thus, the defendant argues he was punished twice for the same crime, once for commission of armed robbery during the murder, and again for armed robbery standing alone.

Such a conclusion requires speculation about the jury's thought processes, not allowed by Louisiana law. *State v. Pegues*, 10-1626 (La. 2/18/11), 56 So.3d 223. In *Pegues*, the defendant was charged with second degree murder and attempted simple burglary, but he was convicted of manslaughter and attempted simple burglary. He argued on appeal that the two convictions subjected him to double jeopardy. This court vacated his conviction for attempted simple burglary based on post-verdict remarks of jurors about how they arrived at their responsive verdict of manslaughter. *State v. Pegues*, 09-1089 (La.App. 3 Cir. 6/9/10), 43 So.3d 1008.

Chief Judge Thibodeaux dissented but noted a double jeopardy violation would occur if the only basis for the manslaughter conviction was the underlying simple burglary. However, if the evidence supported "'the compromise verdict of manslaughter based on specific intent to kill,'" this court could not consider the mental processes of the jury in reaching its verdict. *Pegues*, 56 So.3d at 226. The

Louisiana Supreme Court agreed with Chief Judge Thibodeaux, noting "[b]y deliberate choice, Louisiana law does not provide jurors with special verdicts by which they may reveal at least some of the underlying thought processes leading to a verdict." *Id.* The court surmised the jurors may have "exercised their plenary discretion to compromise their verdict," perhaps to reach a verdict without abandoning their belief of the defendant's guilt. *Id.* at 227.

The same rationale applies here. The verdict of guilty of second degree murder could be simply a compromise verdict. We do not know why the jury reached this verdict. We cannot speculate that it rejected the first degree murder charge because it failed to find the defendant had a specific intent to kill. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant argues the trial court erred in denying his motion for mistrial because of a comment Mr. Mayeux's daughter made during cross-examination. When defense counsel began his cross-examination of Ms. Biven, he apologized for any additional pain his questions might cause. Ms. Biven replied, "[t]here's no reason for you to apologize . . . . The apology needs to come from [the defendant] for his brutal and voluntary involvement of my father's murder . . . and covering him up with a tarp . . . and leaving him there to rot." The trial judge denied the defendant's motion for mistrial and warned Ms. Biven to "restrain [her]self and answer just the questions that are asked." Further, he instructed the jury to:

> disregard the entirety of that statement made by Ms. Biven. Ms. Biven was not a witness to anything that happened at Andrew Mouhot Road, and so her statement as to [the defendant]'s involvement in this matter or what he may have done while he was there should be totally disregarded as this witness does not have the ability to speak as to facts that she does not have personal knowledge of. Also, I will instruct you that you should render your decisions in this matter based

upon the evidence that is presented and not based upon any sympathy or feelings of remorse.  Certainly, Mr. [sic] Biven has lost her father.  That is a fact that is not in dispute in this matter.  And so the Court understands her emotions.  But this matter is also important that [the defendant] be given a fair and impartial trial; and you should decide this case based upon the facts and the facts that are presented from this witness stand, not based upon any sympathy that you may feel towards Mr. Mayeux or Ms. Biven in this matter.

A mistrial is required "when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial[.]"  La.Code Crim.P. art. 775.  When a witness makes a remark or comment that "is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant," the trial judge "shall promptly admonish the jury to disregard" the remark, but he "may grant a mistrial if [he] is satisfied that an admonition is not sufficient to assure the defendant a fair trial."  La.Code Crim.P. art. 771.

Admonition is the preferred remedy when the trial judge is satisfied it will sufficiently protect the defendant.  *State v. Willis*, 05-218 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, *writ denied,* 06-186 (La. 6/23/06), 930 So.2d 973, *cert. denied*, 549 U.S. 1052, 127 S.Ct. 668 (2006).  This court should not disturb a trial judge's decision to admonish the jury and deny the motion for mistrial absent an abuse of discretion.  *Id.*

In *State v. Wessinger,* 98-1234 (La. 5/28/99), 736 So.2d 162, *cert. denied,* 528 U.S. 1050, 120 S.Ct. 589 (1999), *superceded by statute on other grounds*, the murdered victim's mother burst into tears when her daughter's sweater was introduced into evidence.  Next, "an outburst in the courtroom" occurred after a taped 911 call was played.  *Id.* at 183.  The Louisiana Supreme Court upheld the denial of the defendant's motion for mistrial, finding the trial court did not abuse

20

its discretion, and the defendant failed to show how the incidents prejudiced him to the point of warranting a mistrial.

This court relied on *Wessinger* in *State v. Short*, 06-1451 (La.App. 3 Cir. 5/16/07), 958 So.2d 93, *writs denied,* 07-1473 (La. 2/1/08), 976 So.2d 714 and 07-1646 (La. 2/1/08), 976 So.2d 715, *cert. denied*, 555 U.S. 869, 129 S.Ct. 164 (2008), where an outburst by the victim's father led to a responsive outburst by the defendant's father. Based on *Wessinger* and the trial court's instruction to the jury to disregard the outbursts, this court found the assignment of error lacked merit.

We find no abuse of discretion by the trial court in its decision to admonish the jury to disregard the witness's statement rather than grant a mistrial.

### ASSIGNMENT OF ERROR NUMBER FOUR

The defendant alleges his constitutional rights of equal protection and due process were violated in a series of rulings in the trial, appellate, and supreme courts. First, he contends the courts erroneously refused to quash his indictment and dismiss the charges against him. He argues the bill of indictment charging him with first degree murder did not determine whether this was a capital or non-capital case. Rather, that determination was not made until the district attorney elected not to seek the death penalty as provided by La.R.S. 14:30(C). That election then governed the appropriate time limitations, the number of jurors necessary to return a verdict, whether jurors would be sequestered, and the penalty options. Thus, the defendant argues the district attorney's election to forego the death penalty rendered all his charges non-capital, subject to a limitation of two years to bring him to trial. If, however, his case is indeed a capital matter, the defendant contends the non-unanimous jury verdicts violated his constitutional rights.

21

These issues have already been addressed by the Louisiana Supreme Court in response to the defendant's pre-trial writ application. *Clarkson*, 48 So.3d 272. The court noted the joinder of first degree murder, a capital charge, with five other non-capital felonies was improper. The defendant, however, did not move to quash the indictment. Once the district attorney made his election not to seek the death penalty:

> [t]he election had the effect of rendering joinder of the offenses proper under La.C.Cr.P. art. 493.2, which permits joinder of non-capital felonies, even if they are not separately triable by the same mode of trial, provided that trial of the joined offenses is conducted before a jury of 12 persons, 10 of whom must concur to render a lawful verdict.

*Id.* at 273. Further, La.R.S. 14:30(C)(2) applies La.Code Crim.P. art. 782 to first degree murder cases where the district attorney does not seek a capital verdict. Article 782 requires a jury "of twelve jurors, ten of whom must concur to render a verdict" in non-capital cases.

*Clarkson* also addressed the applicable time limitation for bringing the defendant to trial. The court found, based on La.Code Crim.P. art. 578(A)(1), that the initial charge of first degree murder, a capital offense, determined the applicable time limitation. Because all the charges became properly joined after the district attorney's election not to seek a capital verdict, they were all "subject to the three-year time limit for the *case*, although if charged separately at the outset, they were subject to the two-year time limit[.]" *Clarkson*, 48 So.3d at 273.

The prior ruling of the Louisiana Supreme Court constitutes the law of this case and controls the issues of the proper time limitation for bringing the defendant to trial and the non-unanimous verdict.

The defendant also contends the trial court violated his constitutional rights by erroneously releasing three jurors for cause, one of whom was released after he had been sworn.

> A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the entire voir dire reveals the trial judge abused its discretion. . . .
>
> "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Jones,* 474 So.2d 919, 926 (La.1985).

*State v. Odenbaugh*, 10-268, p. 11 (La. 12/6/11), __ So.3d __, __. *See also State v. Juniors*, 03-2425 (La. 6/29/05), 915 So.2d 291, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006).

*Potential jurors Gatson and Chavis*

The district attorney discussed the gravity of the case with potential jurors Anita Gatson and Catrina Chavis. He asked for a commitment from the panel members that they would find the defendant guilty if the evidence was sufficient. Ms. Gatson indicated, "I have a problem with it . . . . This whole thing just don't sit right with me." Ms. Gatson further commented, "[w]ell, I think what's troubling me personally is that I might possibly be selected or sworn to have to render, you know, a decision of guilty on an individual." She believed that first degree murders occur and that trials and juries are necessary. The district attorney asked her directly if she could render a guilty verdict if guilty and a non-guilty verdict if not guilty, and she replied, "[n]o, I don't think I could, not in this ---." When questioned further about being able to render a verdict "even if the evidence is in your mind compelling and beyond a reasonable doubt, Ms. Gatson again said, "I

23

don't think so.  And I'm being absolutely honest. . . .  I wouldn't be comfortable with it, not this particular case."

After questioning a number of other potential jurors, the district attorney returned to Ms. Gatson and asked her, "[c]onsidering everything you've seen and heard and whether you've been specifically asked, individually asked or not, can you, should you serve in this case? . . . Can you apply the law and render a verdict of guilty in this case if the evidence is such that you're convinced beyond a reasonable doubt?"  Ms. Gatson responded, "[n]o."

When questioned by defense counsel, Ms. Gatson said she did not think it was impossible for her to judge the case based on what she heard in the courtroom, but "it would be troublesome."  She thought she could follow the law according to what the judge told her it was.  She could return a not guilty verdict if that was what the evidence showed.

Potential juror Catrina Chavis also expressed, "I think it's the crime that's bothering me."  She, like Ms. Gatson, when asked for her final answer to the question of whether she could apply the law and render a guilty verdict if the evidence convinced her beyond a reasonable doubt, answered "[n]o."  The district attorney asked if he could "talk [her] into it," and whether there was "anything [he] could say or explain that would make [her] answer yes," and she again replied, "[n]o."  She then said she would try to do her best if she had to, but the crime and the punishment really bothered her, and she "would prefer not to be involved."  If she were on trial, she would want a juror in her frame of mind.

After questioning of this panel concluded, the state challenged Ms. Gatson and Ms. Chavis for cause.  Defense counsel argued they both said they could listen to the law and evidence and decide the case fairly and impartially.  The district

24

attorney contended they would not be able to find the defendant guilty, "no matter what [he] presented."

The trial judge noted the challenges presented "a difficult question." He believed it "abundantly clear" from the state's questions that neither "could be fair and impartial in this matter." He noted no rehabilitative questions were asked regarding their opinions "about not being able to be fair and impartial to the state and returning a guilty verdict if the evidence supported that[.]"

Both ladies indicated they could reach a not guilty verdict if the evidence showed the defendant was not guilty, but they could not find him guilty even if the evidence showed he was. Their responses during *voir dire* reasonably imply their "bias, prejudice or inability to render judgment according to law." *Jones*, 474 So.2d at 926. The trial court did not abuse its discretion in granting both challenges.

The defendant also raised an objection to the dismissal of these two potential jurors based on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986). *Batson* applies to the state's use of peremptory challenges for purposes of excluding potential jurors based on their race. The challenges granted here were causal, not peremptory. Further, the defendant has not argued the trial judge granted the causal challenges for reasons involving race. *Batson* does not apply to challenges for cause.

*Potential juror Andrus*

During *voir dire*, juror Gerard Andrus stated he would want a juror in his frame of mind on his own jury. Mr. Andrus was selected for the empaneled jury. On February 24, 2011, before opening statements or any witness testimony, Mr. Andrus approached the trial judge during a lunch break. He told the trial judge:

he did not sleep last night and was very concerned about his ability to be fair in this matter considering that the penalty if [Defendant] were found guilty as charged of certain of the offenses in this matter, or even, perhaps, some of the responsive verdicts, being life imprisonment, that that was, perhaps, more than he could bear on his conscience.

Based on Mr. Andrus's remarks, the trial judge allowed additional *voir dire* of Mr. Andrus outside the presence of the remainder of the jury. Mr. Andrus indicated he understood he would be expected to "come in and say guilty" if the evidence was sufficient and not guilty if it was not. He understood the defendant would die in prison if found guilty as charged and sentenced to life imprisonment, and that "seriously bother[ed him]." He "would lean more towards not sending him to jail . . . [he] wouldn't want to have that on [his] head, that [he] sent somebody to jail for life and they, like you said, die in jail."

Mr. Andrus could not "say positively that [he] would be able to say yes, go ahead and lock this man up because he committed the crime." He might not be able to find the defendant guilty simply because of the severity of the punishment. He felt so strongly he had to let the court know. He could not say he "would give a fair trial." Mr. Andrus verified he told the trial judge he would have to see a video "that the person did the crime" in order to put someone in jail for life. Of course, no such video existed.

Defense counsel reviewed the principle of reasonable doubt. Mr. Andrus then said he would follow the law as the judge gave it to him to the best of his ability and decide the case based on proof beyond a reasonable doubt.

The trial judge asked Mr. Andrus if he could find the defendant guilty of a crime with a penalty of life imprisonment with an instruction about reasonable doubt. Mr. Andrus replied:

26

Shoot. I think that I could. I think I could, but I'm not saying that – It would be really hard for me to do that. Because it's just really not in my nature to punish somebody that – you know, to that extent.

The trial judge noted Mr. Andrus sought him out to tell him how much this case troubled him and how "he just didn't think he could be a fair juror." When Mr. Andrus was "point-blank asked" whether he could find the defendant guilty, "his answer wasn't yes. It was, 'I think I can, but I'm not sure.'" The trial judge considered that response, together with "the look on his face, [and] the wringing of his hands in response to all of these questions" and determined Mr. Andrus could not be a fair and impartial juror. Mr. Andrus was replaced with the first alternate juror.

"If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course." La.Code Crim.P. art. 796. The state shows good cause for a challenge when "[t]he juror is biased against the enforcement of the statute charged to have been violated[.]" La.Code Crim.P. art. 798(1). This court has held "that La.Code Crim.P. art. 789 permits replacement of a juror with an alternate juror when the juror is physically unable to serve, or when the juror is found to have become disqualified, or to have either the real or potential for bias in the deliberations." *State v. Tennors*, 05-538, p. 15 (La.App. 3 Cir. 2/15/06), 923 So.2d 823, 833.

The trial judge did not abuse his discretion in dismissing Mr. Andrus from the jury. The trial judge was able to evaluate Mr. Andrus's entire demeanor — not just his words, but also his facial expressions, gestures, and overall bearing. Mr. Andrus did not indicate his ability to be fair and impartial. He spoke only of his efforts to do so and could not be certain. In other words, he demonstrated "the real

27

or potential for bias in the deliberations." *Id.* Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

The defendant argues the trial court erroneously denied his motion for new trial and claims his constitutional rights were violated by a "real-time blog" by a television reporter in the courtroom. He claims the trial judge violated the Louisiana Code of Judicial Conduct, Canon 3, by permitting the recording and reproduction of proceedings without his consent. The defendant contends the trial judge's instructions regarding sequestration of the witnesses were insufficient because they failed to address watching or reading media coverage.

When the witnesses were sworn, they were told they would not be allowed in the courtroom except during their own testimony, and they could not discuss their testimony with anyone other than the attorneys involved. Neither counsel requested any further instruction. However, they apparently did not become aware of the reporter's "blogging" until much later in the proceedings.

After the defendant proffered testimony of three witnesses, defense counsel informed the trial judge he had just learned a television news reporter had "a live feed going out of here." The trial judge noted "she can run right out the door and do the same thing" without the "blog." Defense counsel made no further indication of displeasure involving the reporter until the filing of his motion for new trial.

"The purpose of the sequestration article [La.Code Evid. art. 615] is to prevent witnesses from being influenced by the testimony of earlier witnesses." *State v. Draughn*, 05-1825, p. 57 (La. 1/17/07), 950 So.2d 583, 621, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007), (citing *State v. Chester,* 97-2790 (La.

28

12/1/98), 724 So.2d 1276, *cert. denied,* 528 U.S. 826, 120 S.Ct. 75 (1999)). The trial court's sequestration order admittedly did not contemplate the situation that arose. Indeed, Louisiana law does not appear to have addressed this technologically-current scenario. However, the defendant cites no prejudice resulting from the "real-time blog." He has offered no reason to suggest the defendant did not receive a fair trial simply because it occurred. There is no evidence any witness was exposed to the blog. Without any such showing of prejudice, the defendant's argument lacks merit.

## ASSIGNMENT OF ERROR NUMBER SIX

The defendant contends the trial court erroneously limited evidence at trial that would question D.B.'s credibility. D.B. testified at trial that none of the allegations he made against the defendant were false. He said he had not been back on the Yellott property since at least August of 2009.

The trial court disallowed testimony designed to refute this claim. The proffered testimony of Dorothy Johnson, the current resident at the Yellott property, would have shown she had seen D.B. at her residence, looking through the window, and she had picked him out of a photo lineup. Ms. Johnson would have also testified someone whom she could not identify had been in her house coming from the bathroom area where the guns involved in the murder were at one time hidden. This occurred after Ramsdell's trial on August 7, 2009.

Bruce Johnson's proffered testimony would have shown he saw D.B. outside his home after dark on a different occasion. He had also seen D.B. walking in front of his home on different occasions during early morning hours. Mr. Johnson likewise picked out D.B. from a photo lineup. Proffered testimony of Steve Darrah

of the Beauregard Parish Sheriff's Department would have confirmed the Johnson's photo lineup identification.

The trial court found the evidence sought to be introduced by the defendant to be improper impeachment evidence, stating:

> The Court is going to refer back, as it did earlier, to Article 607 of the Code of Evidence, which provides that: "Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony." But that is read in connection with 609.1 and 608, particularly 608B, which says that: "Particular acts, vices, or courses of conduct of a witness by not be inquired into or proved by extrinsic evidence for purpose of attacking his character for truthfulness, other than conviction of a crime or as constitutionally required."

> In other words, in the Court's opinion, the only thing that makes this a closer call is the fact that the address which you asked him if he had been to or not was the location where the evidence has shown that the items that were taken from Mr. Mayeaux's [sic] residence were taken. But if you had asked him if he had ever smoked marijuana and he said no and you had proof that he smokes daily, that would not be admissible. Or if you had asked him if he -- as you suggested, that he had ever been to my house and he said no and, yet, he had or Mr. Morton's house or your house and he clearly lied about that, that would not be admissible evidence to show simply that he was untruthful.

> I allowed in the evidence of the juvenile adjudication as much to show his -- to attack his credibility, but probably even more so because of the potential to show witness bias. He was, at least arguably, although there was some discrepancy as the exact date of the adjudication, he was probably on probation, as best we can tell; and, clearly, the case law seems to suggest that a person being on probation, or even with criminal charges pending, that puts it in a whole different category as far as the adjudication during the time of this offense, because it could affect his bias or prejudice in the stories that he told or the testimony that he gave. And for that same reason, I allowed in the issue of, during the same time period of his testimony, admittedly false, concerning criminal allegations against someone else. But, to me, this is -- there is no relevance, other than speculation on the defense's part, that his going back to this address was somehow connected with this case.

> And, more importantly, to be relevant, it has to prove or disprove an element of the charges against [the defendant]. And for that reason, I don't find that it meets any of the exceptions to the Code of Evidence which would in general say that it's improper impeachment evidence. And so for that reason, I'm not going to allow it.

We agree with the trial court's analysis and application of the law. The testimony the defendant sought to introduce pertaining to D.B.'s truthfulness was based on alleged acts, which he denied, which were collateral to the matter before the court, and which lacked relevance to this proceeding. This evidence was properly excluded.

## PRO SE ASSIGNMENTS OF ERROR ONE AND TWO

The defendant submitted a pro se brief arguing 1) the trial court erred in denying the motion for grand jury transcript he filed on September 6, 2011, and the second motion for the same relief on September 20, 2011, and 2) the trial court improperly denied the defendant's motion to vacate and dismiss the charges, which he filed on September 2, 2011.

The trial court signed an order granting the defendant's appeal on May 23, 2011. At the time the defendant's motions were filed, the trial court had been divested of jurisdiction in this matter and lacked the legal authority to act on those motions. La.Code Crim.P. art. 916. These issues are not properly before this court, and they are more properly raised through a post-conviction relief application. They will not, therefore, be considered.

## CONCLUSION

The defendant's convictions and sentences are affirmed.

**AFFIRMED.**