HIGGINBOTHAM, J.
The defendant, David Leger, was charged by grand jury indictment with five counts of vehicular homicide, a violation of La. R.S. 14:32.1, and pled not guilty. Following a jury trial, he was found guilty as charged. Subsequently, the defendant filed motions for post-verdict judgment of acquittal and new trial and filed a motion to recuse the trial judge, who initially denied the motion to recuse. This court vacated that ruling and ordered that the motion to recuse be randomly allotted to another judge for disposition. State v. Leger, 2014-1518 (La. App. 1st Cir. 10/16/14), 2014 WL 12570083 (unpublished), writ denied, 2014-2200 (La. 11/5/14), 152 So.3d 161. Following the random allotment for purposes of that motion, the motion to recuse was granted by Judge Donald Johnson and the case was ordered to be randomly allotted for further proceedings. Following reallotment to Judge Richard "Chip" Moore, the trial court denied the defendant's motion for post-verdict judgment of acquittal, but granted his motion for new trial. The Louisiana Supreme Court reversed the grant of the new trial and remanded for reconsideration.[1]
*581 State v. Leger, 2015-1720 (La. 2/19/16), 184 So.3d 685 (per curiam). Following that remand, the defendant filed a renewed motion for new trial, which was denied by the trial court. Thereafter, the defendant was sentenced on count six[2] to a fine of two thousand dollars, and five years imprisonment at hard labor, three years to be served without benefit of probation, parole or suspension of sentence, to run consecutively to the sentences imposed on counts seven through ten; on count seven to a fine of two thousand dollars, and five years imprisonment at hard labor, three years to be served without benefit of probation, parole or suspension of sentence and three years of that sentence to be served consecutively to the sentences imposed on counts six and eight through ten; on count eight to a fine of two thousand dollars, and five years imprisonment at hard labor, three years to be served without benefit of probation, parole or suspension of sentence, to run concurrently with the sentences imposed on counts six, seven, nine and ten; on count nine to a fine of two thousand dollars, and five years imprisonment at hard labor, three years to be served without benefit of probation, parole or suspension of sentence, to run concurrently with the sentences imposed on counts six through eight and ten; and on count ten to a fine of two thousand dollars, and five years imprisonment at hard labor, three years to be served without benefit of probation, parole or suspension of sentence, to run concurrently with the sentences imposed on counts six through nine.
The defendant appeals, asserting the evidence at trial was insufficient to convict him of vehicular homicide, his rights to a fair trial and due process were violated when the trial judge failed to preside impartially over the trial, the trial court erred when it denied the defendant's motion to challenge a potential juror for cause, the trial court erred when it allowed *582 the prosecution to introduce highly prejudicial evidence, the trial court erred when it denied the defendant's requested jury instructions, the trial court erred when it denied the defendant's motion for new trial, and the trial court erred in disproportionately sentencing the defendant when compared to his co-defendant.
FACTS
On March 13, 2011, at approximately 8:30 p.m., five people, Effie Fontenot, her three sons, Austin Fontenot, Hunter Johnson and Keagan Fontenot, and her friend and co-worker, Kimberly Stagg, died in a motor vehicle collision in the eastbound lanes of Interstate 10 in East Baton Rouge Parish. The defendant's vehicle, originally traveling in the westbound lanes of Interstate 10, crossed the median, first striking an eighteen-wheeler trailer, then colliding with the victims' vehicle, which burst into flames, killing the victims.
Several minutes prior to this collision, the defendant was driving a white pickup truck westbound on Interstate 10. At the same time, Kelsye Hall ("Hall") was also driving a green Mercedes SUV westbound on Interstate 10. Several eyewitnesses, who were also driving in the westbound lanes of Interstate 10, testified at trial. According to Dara Soulier ("Soulier"), when she looked in her mirror she saw two vehicles approaching from behind her, and she noticed flashing lights on the defendant's vehicle. Soulier testified that Hall's vehicle was swerving back and forth, and the defendant's vehicle was trying to pass it. Soulier was in the right lane, and both vehicles passed her at a speed in excess of the speed limit of seventy miles-per-hour. It appeared to her that Hall was not allowing the defendant to pass. Soulier said that the defendant would get over to pass, and then Hall would get over, ride the center line back and forth and not allow the defendant to pass. She described the vehicles as playing "cat and mouse." According to Soulier, the defendant did not disengage from playing, did not slow or try to fall back, continued at a high rate of speed, and continued to try to pass Hall. After the vehicles passed her, Soulier observed taillights on the shoulder of the roadway, then saw the defendant's vehicle "shoot" across the interstate and the median, striking an eighteen-wheeler and vehicle.
Kevin Patton ("Patton"), also traveling westbound, testified that Hall's vehicle passed him at a very high rate of speed and rapidly pulled in front of him, almost clipping his bumper. Very shortly after, the defendant passed him at a similar speed and appeared to be following Hall very closely. At the time, Patton thought the vehicles were following each other, like "cat and mouse," chasing each other, or were engaged in "road rage," and he observed that both vehicles were darting in and out of traffic. Patton testified that the defendant did not appear to slow down or disengage. After these two vehicles were approximately ten to fifteen car lengths ahead of him, Patton observed the defendant's vehicle go to the shoulder, then veer back across, through the median, hitting vehicles traveling eastbound. Several other witnesses who were traveling eastbound on Interstate 10 at the time, including the driver of the eighteen-wheeler, testified at trial that they observed the defendant's vehicle cross the median, hit the eighteen-wheeler, then collide with the victims' vehicle.
Hall, who was charged and convicted of five counts of negligent homicide in this case, testified at the defendant's trial. According to Hall, while she was driving that night on Interstate 10, she noticed a white pickup truck following her closely, and the truck engaged its bright lights, then flashed the lights. When she got into the *583 right lane, the truck followed her, and although she tried to let the truck pass her several times, the truck continued to follow her, and this happened multiple times over an approximately ten mile distance. Hall testified that, as she was in the right lane, the truck came around on the shoulder of the roadway, swerved and cut back in front of her vehicle, clipping the front of her vehicle. The truck then went to the right, and Hall went to the left, the truck turned perpendicular and went into the median, hitting vehicles in oncoming traffic. Hall exited at the next exit and returned to the scene on the eastbound side of the interstate. Hall denied that she tried to cut off the defendant or that she swerved between both lanes to prevent him from passing her. Hall admitted that she was straddling both lanes of the interstate, but asserted she did this because the defendant continued following her with bright lights flashing, and she had already allowed him the opportunity to pass multiple times, but he would not pass her. Hall testified that she did not believe she did anything wrong that night and described herself as a "victim."
Louisiana State Police Trooper James Summerford ("Trooper Summerford") arrived at the scene, as the fire department was extinguishing the vehicle fire. The defendant's vehicle was in three pieces, the defendant had been ejected from the vehicle, and his passenger was still being cut out of the vehicle. Both were transported to the hospital. Trooper Summerford documented damage to the front headlight and adjacent area of Hall's vehicle and damage to the left rear trailer of the eighteen-wheeler, where a tire was missing from one rim and the rim was bent. A partially empty bottle of "Captain Morgan," intact and with the cap on, was found inside the defendant's vehicle. Although Trooper Summerford was able to determine there was a collision between the defendant and Hall on the westbound side of the interstate, he was unable to determine the exact location of that collision. Louisiana State Troopers marked and tracked the path of the defendant's vehicle through the median, and assisted with the scene and the investigation. Trooper Burnell Thompson ("Trooper Thompson"), after assisting with traffic and the accident scene, went to the hospital to meet with the defendant. He read the defendant his rights and obtained his consent in providing a blood sample, which was drawn by a nurse at 11:06 p.m. and maintained in the chain of custody. At trial, the parties stipulated to the admission of the results of this test, which showed a blood alcohol concentration of 0.10 grams percent. After returning to the scene, Trooper Thompson subsequently took Hall to the troop headquarters for a breath intoxilyzer test, to which she voluntarily submitted at 12:16 a.m., and which showed no trace of alcohol.
Trooper Darryl Davis ("Trooper Davis") was accepted by the court as an expert in accident reconstruction. Trooper Davis assisted in the investigation at the scene, taking photographs and using a mapping device to take measurements. According to Trooper Davis, there were no skid marks or debris in the westbound lanes to indicate the exact location of the collision between Hall and the defendant. Trooper Davis noted that there was contact between the two vehicles, then the defendant's vehicle rotated and was out of control where he crossed the center median. Trooper Davis testified that after crossing into the eastbound lanes, the defendant struck the eighteen-wheeler, then struck the victims' vehicle, likely stopping it in its tracks, and that shortly thereafter, the victims' vehicle caught on fire. Trooper Davis noted an imprint of the defendant's front tire in the radiator of the victims' vehicle, further opining that these collisions *584 all occurred very violently. Trooper Davis was unable to determine the cause of the collision between Hall and the defendant.
The defense expert, Michael Gillen ("Gillen"), was accepted by the court as an expert in accident reconstruction. Gillen testified that the dent to Hall's vehicle near the headlight had a rounded cup profile consistent with the left rear corner of the defendant's vehicle's bumper. Gillen opined that the sudden redirection of the defendant's vehicle, from the eyewitness statements and the physical evidence of the tire marks and damage to Hall's vehicle, was consistent with the front of Hall's vehicle making contact with the left rear corner of the bumper of the defendant's vehicle. This resulted in a shifting of the rear of the defendant's vehicle to the right which, in turn, redirected the front of the defendant's vehicle to the left, resulting in an unexpected redirection of the defendant's vehicle that sent him projecting across the travel lanes of the westbound interstate in the center median. Gillen's opinion was that Hall moved into the rear of the defendant's vehicle, based upon the fact that Hall did not lose control, i.e., she was expecting it and able to maintain control through the collision. Gillen opined that this collision caused such a significant redirection of the defendant's vehicle that no person, drunk or sober, could avoid this change in direction, and the defendant's intoxication did not have anything to do with the redirection because there was no evidence of any loss of control until this contact. The defendant's vehicle was rotating counter-clockwise as he left the westbound lanes. Gillen opined that, as the defendant was coming out of the median, he was no longer rotating, which indicated steering input by the defendant, which suggested perception and reaction to the event and did not indicate the actions of an impaired driver. The distance across the median was approximately 170 feet, and at seventy miles-per-hour, the reaction time would be one-and-one-half seconds, which is within a normal range of perception. Gillen testified that, without steering input, grass would have been piling up on the right side of the defendant's vehicle against the wheels, and would have caused the defendant's vehicle to roll over. The defendant's vehicle struck the left rear tandem axles of the eighteen-wheeler, knocking off one tire and causing heavy damage to the steel wheel, which corresponded to heavy damage and black smudging on the left rear side of the defendant's vehicle. This collision caused another redirection of the defendant's vehicle, rotating it to the left, and the defendant's vehicle then impacted the victims' vehicle. The tire mark in the front grill of the victims' vehicle corresponded with the front tire of the defendant's vehicle. Relying on the overall travel distance documented by the investigating officers and speeds of seventy miles-per-hour, Gillen opined that the post-impact distance from the collision with Hall's vehicle to the final resting place of the defendant's vehicle was 306 feet and occurred in a three second time frame. Gillen further opined that he did not think this accident would have happened if both vehicles had behaved reasonably.
SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, the defendant challenges the sufficiency of the evidence to support the convictions for vehicular homicide. In his brief, the defendant acknowledges that there was no question at trial that this collision caused the deaths of the five victims. However, the defendant contends that the jury erred in finding that his blood alcohol concentration was a proximate cause of the collision.
*585 A conviction based on insufficient evidence cannot stand, as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B) ; State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660 ; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in La. Code Crim. P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, in order to convict, the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Wright, 98-0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 487, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157 & 2000-0895 (La. 11/17/00), 773 So.2d 732.
An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. State v. Thomas, 2005-2210 (La. App. 1st Cir. 6/9/06), 938 So.2d 168, 174-75, writ denied, 2006-2403 (La. 4/27/07), 955 So.2d 683. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness, including an expert. State v. Ducksworth, 496 So.2d 624, 634 (La. App. 1st Cir. 1986). The fact that the record contains evidence that conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1st Cir. 1985).
At the time of the collision at issue herein, La. R.S. 14:32.1 provided in pertinent part:
A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle ... whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exist and such condition was a contributing factor to the killing:
1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.[3]
(2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.
* * *
*586 (4) The operator is under the influence of alcoholic beverages.
Under the vehicular homicide statute, the state, "in order to convict, must prove that an offender's unlawful blood alcohol concentration combined with his operation of a vehicle to cause the death of a human being." State v. Taylor, 463 So.2d 1274, 1275 (La. 1985). The statute should be construed to require proof of a causal relationship between an operator's unlawful blood alcohol concentration and the death of the victim in order to convict. Id. The evident purpose of the vehicular homicide statute is to curb traffic fatalities caused by the consumption of alcohol. It is not aimed at persons involved in vehicular fatalities whose alcohol consumption does not cause but merely coincides with such an accident. Id. The defendant's intoxication need not constitute the sole cause of the killing, but rather, need only be a contributing factor. See La. R.S. 14:32.1 ; State v. Dock, 49,784 (La. App. 2d Cir. 6/3/15), 167 So.3d 1097, 1103. Causation is a question of fact which has to be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct. State v. Kalathakis, 563 So.2d 228, 231 (La. 1990).
The defendant argues, as he did at trial, that Hall was driving recklessly, deliberately preventing him from safely passing, and the initial impact occurred when Hall's vehicle struck the defendant's vehicle from behind, causing it to careen across the median into oncoming traffic. The defendant further argues that the defense expert concluded that no driver in the defendant's position, drunk or sober, would have been able to avoid the subsequent collisions after the impact from Hall. The defendant also references a post-verdict meeting between Judge White, the trial attorneys and the jurors, relying on the representation that none of the jurors could answer the question of how they determined that the defendant's blood alcohol level was a proximate cause of the collision. However, this court finds it would be improper to consider a summary of alleged comments from jurors. Louisiana Code of Evidence article 606(B) prohibits a juror's testimony as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or concerning his mental processes in connection therewith, except as to outside influences, not at issue herein. This information was provided through an affidavit of the defendant's trial counsel in connection with post-trial defense motions. The "indirect circumvention" of such rule by the use of trial counsel's affidavit to attest to such statements is equally improper. See State v. Pegues, 2010-1626 (La. 2/18/11), 56 So.3d 223, 227 (per curiam), writ denied, 2010-2058 (La. 2/18/11), 57 So.3d 330, in which the supreme court found that the court of appeal indirectly circumvented this provision when it seized upon the trial judge's summary of the post-trial jury interview as a basis for invalidating the jury verdict.
In this case, there is no doubt that the defendant was intoxicated as his blood alcohol concentration was above the legal limit. However, a thorough review of the record discloses that the evidence failed to prove, beyond a reasonable doubt, that the defendant's intoxication was a contributing factor to the deaths of the five victims herein. Courts have recognized that intoxication, with its attendant behavioral manifestations, is an observable condition about which a witness may testify. State v. Allen, 440 So.2d 1330, 1334 (La. 1983). In other cases in which this court has affirmed convictions for vehicular homicide, *587 finding it reasonable for the jury to infer that a defendant's blood alcohol concentration contributed to the death, there was evidence of observable manifestations of the intoxication, in addition to the laboratory results. See State v. Watts, 2014-0429 (La. App. 1st Cir. 11/21/14), 168 So.3d 441, 445-46 writ denied, 2015-0146 (La. 11/20/15), 180 So.3d 315, in which the defendant's blood alcohol concentration was .09 percent two hours after the collision, there was additional evidence documenting his speed at 95 miles per hour two seconds prior to impact, and an investigating officer testified he could smell alcohol on the defendant's breath and the defendant had red, bloodshot and glossy eyes; State v. Melerine, 2012-1565 (La. App. 1st Cir. 5/2/13), 2013 WL 1843379 (unpublished), in which the defendant's blood alcohol concentration was .101 percent, and there was additional evidence from an investigating officer that he could smell alcohol on the defendant's breath, his eyes were glassy and bloodshot, and he swayed as he stood and appeared unsteady on his feet. The defendant therein performed poorly on all field sobriety tests, and according to the officer, his level of impairment was obvious; State v. Williams, 2009-0283 (La. App. 1st Cir. 9/14/09), 2009 WL 3011212 (unpublished), writ denied, 2009-2229 (La. 4/16/10), 31 So.3d 1052, in which the defendant's blood alcohol concentration was .07 percent approximately three hours after the collision, and the investigating officer testified that the defendant had a strong odor of alcohol on his breath, bloodshot and glassy eyes and his speech was slurred; State v. Price, 2005-2514 (La. App. 1st Cir. 12/28/06), 952 So.2d 112, 117 (en banc), writ denied, 2007-0130 (La. 2/22/08), 976 So.2d 1277, in which, in addition to the report which showed the defendant's blood alcohol concentration was .25 percent, there was evidence regarding the defendant's acts of doing "doughnuts" and "brake talking" in the parking lot shortly before driving down the highway, that the victim told her friend that the defendant was "driving messed up," and that the investigating officer detected a strong odor of alcohol on the defendant's breath and noted that the defendant's speech was a little slurred.
Although one of the investigating officers herein testified that he suspected the defendant had been drinking, he did not further detail any observable manifestations underlying that suspicion. Therefore, there was no evidence as to the defendant's behavior or demeanor specifically associated with alcohol consumption, and the defense accident reconstruction expert opined that he did not think the defendant's intoxication caused the redirection of the defendant's vehicle from the westbound lanes of the interstate. Accordingly, the jury had before it the report confirming the defendant's blood alcohol concentration, but it did not have further evidence as to the defendant's appearance, observable signs of impairment, the effect of such a blood alcohol level upon a reasonable person, or other evidence from which to reasonably infer beyond a reasonable doubt that the defendant's intoxication was a contributing factor to this collision, an element of the crime of vehicular homicide. In fact, the jury had before it evidence of the actions and omission of the co-defendant Hall, which showed equally bad behavior without intoxication, and there was insufficient evidence to differentiate their criminal behaviors, so as to reasonably infer intoxication as a contributing factor to the defendant's conduct. Although this court is mindful of the horrific loss of five innocent victims herein, we are constrained to find the evidence was insufficient to prove that the defendant's unlawful blood alcohol concentration was a *588 contributing factor to those deaths beyond a reasonable doubt.
Pursuant to La. Code Crim. P. art. 821(E) and State v. Byrd, 385 So.2d 248, 251 (La. 1980), if an appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post-verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense. Negligent homicide is a lesser included responsive offense to the crime of vehicular homicide. La. Code Crim. P. art. 814(7.1). Negligent homicide is the killing of a human being by criminal negligence. La. R.S. 14:32(A)(1). Criminal negligence exists when, although neither specific nor general intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La. R.S. 14:12. See State v. Martin, 539 So.2d 1235, 1238 (La. 1989) (The Court affirmed the defendant's convictions as principal to negligent homicide, finding ample evidence supported the jury's finding that the defendant's conduct, i.e., driving at high speed on a busy highway, weaving in and out of the right lane, and following another car very closely, was a "gross deviation below the standard of care" expected of him under the circumstances.); State v. Hammontree, 363 So.2d 1364, 1372 (La. 1978) ("Reasonably careful men are expected to obey safety laws, and it is within the province of the legislature to permit the inference that one who violates a safety law and thereby injures another is guilty of criminal negligence; and if it is proved beyond a reasonable doubt that the criminal negligence was the cause of death, the perpetrator may be guilty of criminal homicide.") The evidence did prove, beyond a reasonable doubt, that the defendant herein was guilty of five counts of negligent homicide, and accordingly, we modify each of the convictions herein to negligent homicide. Accordingly, the sentences are vacated, and this matter is remanded to the trial court for sentencing on the modified convictions.
As a result of this court's entry of the modified convictions herein, we find it unnecessary to consider the defendant's assignments of error five, six and seven addressing the alleged improper denial of jury instructions regarding causation, the denial of a motion for new trial based upon the alleged error in the jury instructions, and the alleged excessiveness of the defendant's sentence. However, the court will further address the other alleged trial errors, which the defendant argues entitle him to a new trial.
RIGHT TO FAIR TRIAL AND DUE PROCESS
In his second assignment of error, the defendant asserts that his rights to a fair trial and due process were violated because he did not have an impartial judge presiding over his trial.
After this trial, the defendant filed a motion to recuse Judge Trudy White, who had presided over the trial. At the hearing on this motion before Judge Donald Johnson, Alfred Williams ("Williams"), the attorney who represented Hall in her criminal proceeding and who ran against Judge White in her re-election for district judge, testified that, immediately after the Hall trial, Judge White asked he and the assistant district attorney why the Hall case was tried before the defendant's case because she could have "gotten a piece of flesh." Williams also described another private conversation between him and Judge *589 White, in which Judge White told him he proved reasonable doubt, but she could not find Hall not guilty after seeing photographs of the deceased children and their families in court.
The defendant's trial attorney, Thomas D'Amico ("D'Amico"), testified at this recusal hearing that he was unaware of Judge White's conversation with Williams until after new counsel enrolled for the defendant. He further described a bench conference with Judge White which occurred when the defendant sought to substitute new counsel for post-trial motions and sentencing and obtain a continuance of the sentencing date, in which Judge White expressed concern over the sentencing date for the defendant. According to D'Amico, Judge White wanted to have the sentencing done prior to the election date for her judicial seat, noting her opponent was involved in the case and she seemed to think this case was an issue in the election. Ronald Gathe ("Gathe"), the assistant district attorney who handled the trial of this case, also testified at the hearing. With regard to the discussion in chambers with Judge White and Williams following the Hall trial, Gathe testified that Judge White pointed at them and said she was mad at each of them. When they asked what she was talking about, she responded that she was mad at Gathe because he took the Hall case to trial first and was mad at Williams because he made it a bench trial. According to Gathe, nothing was said to suggest a bias toward the defendant. Although Gathe did recall Judge White asking why the Hall case was tried first, he did not recall a statement by her that she could have "gotten a piece of flesh." With regard to the defendant's sentencing, Gathe objected to a continuance because the victims' families had already had it continued once. He and the defendant's new counsel spoke to Judge White about the requested continuance. He recalled that Judge White was leaning toward a denial of the continuance, because she was involved in an election and her opponent was Hall's attorney. Judge White commented that, because Williams was involved in the Hall case, if she lost the election, Williams would have to be recused, which would be unfair to the families. Gathe did not recall Judge White stating that she wanted the sentencing to occur before the election because it was a political issue.
The motion to recuse Judge White was granted. Judge Johnson recognized that there was testimony that Judge White was interested in the sentencing date and political reasons were expressed, although there was no express finding that Judge White was interested in the sentence. The court further found that if Judge White was not recused, there would be an inference that she was interested in the sentence itself. The state sought supervisory review with this court of the granting of the motion to recuse. This court denied that writ application. State v. Leger, 2014-1704 (La. App. 1st Cir. 11/26/14), 2014 WL 12579660.
The defendant argues that these comments and actions of Judge White manifested a serious bias, or at least the appearance of bias, which requires that the defendant's convictions herein be set aside and a new trial be ordered. The defendant argues that the bias was evident in the trial court's rulings against the defendant at trial, including the denial of the cause challenges, denial of a justified request for jury instructions, and the summary denial of post-verdict motions without reviewing them. The motion to recuse alleged that Judge White was biased, prejudiced, or personally interested in the case to such an extent that she would be unable to conduct fair and impartial proceedings, which constituted sufficient grounds for *590 recusal pursuant to La. Code Crim. P. art. 671(A)(1).
Due process guarantees "an absence of actual bias" on the part of a judge. Williams v. Pennsylvania, --- U.S. ----, 136 S.Ct. 1899, 1905, 195 L.Ed.2d 132 (2016). In ruling on the motion to recuse Judge White herein, there was no finding of actual bias, but the trial court found that there would be an inference that Judge White was interested in the sentence if she was not recused. The Supreme Court has recognized that "most matters relating to judicial qualification do not rise to a constitutional level." Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 820, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823 (1986). The Supreme Court has identified actual bias and presumptive bias as requiring recusal under the Due Process Clause. Richardson v. Quarterman, 537 F.3d 466, 475 (5th Cir. 2008), cert. denied, 555 U.S. 1173, 129 S.Ct. 1355, 173 L.Ed.2d 589 (2009). "Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that 'the probability of actual bias ... is too high to be constitutionally tolerable.' " Id. The Supreme Court has only found that a judge's failure to recuse constitutes presumptive bias in three situations: (1) when the judge has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) when the judge has been the target of personal abuse or criticism from the party before him; and (3) when the judge has the dual role of investigating and adjudicating disputes and complaints. Id. "[B]ias by an adjudicator is not lightly established." Id. at 474.
Although the trial court herein granted the motion to recuse such that no inference of bias or prejudice would be present at sentencing, the defendant argues that the comments allegedly made by Judge White, i.e., for a "pound of flesh" or that sentencing be set prior to the election, and the rulings by Judge White demonstrate her bias or prejudice. Adverse rulings alone do not show bias or prejudice. Earles v. Ahlstedt, 591 So.2d 741, 746 (La. App. 1st Cir. 1991). Moreover, judicial opinions will support an actual bias claim if they reveal favoritism or antagonism such that fair judgment is impossible. Buntion v. Quarterman, 524 F.3d 664, 673 (5th Cir. 2008), cert. denied, 555 U.S. 1176, 129 S.Ct. 1306, 173 L.Ed.2d 593 (2009). Even if a judge is disqualified under state law, the disqualification is not always required by the Due Process Clause. Richardson, 537 F.3d at 474-75. Moreover, the defendant herein was convicted by a jury, not by Judge White, and subsequently, after the recusal, another judge handled and ruled on post-trial motions and sentencing. The purpose of trial by jury is to prevent oppression by the government by providing a safeguard against a biased or eccentric judge. Apodaca v. Oregon, 406 U.S. 404, 410, 92 S.Ct. 1628, 1632, 32 L.Ed.2d 184 (1972). After Judge White's recusal, in ruling on the defendant's motion for new trial, Judge Johnson noted that he read nothing in the record where Judge White made any statement or took any action which indicated that personal bias, prejudice, or interest affected or played a role in the outcome of this trial. Likewise, this court has thoroughly reviewed this record and found no evidence of bias on the part of Judge White during the trial. While the defendant points to adverse rulings by Judge White, the record reflects that Judge White ruled in favor of the defendant on a number of occasions with regard to a state challenge for cause, evidentiary matters, and a requested change to the jury instructions. Following a thorough review of the record of this proceeding, this court finds no due process violation. Accordingly, *591 this assignment of error lacks merit.
JUROR CHALLENGE FOR CAUSE
In his third assignment of error, the defendant asserts the trial court erred when it denied his challenge for cause as to prospective juror, Deborah Magee ("Magee"), who expressed sympathy toward the victims.
A review of the record of this proceeding does not support the underlying premise of the defendant's claim. Although the trial court initially denied the defendant's challenge for cause as to Magee, following further voir dire by both the prosecution and defense, both sides agreed to excuse Magee for cause, which is further evidenced by the written challenge sheets signed by both counsel. Contrary to the defendant's assertion, Magee was excused for cause. Accordingly, this assignment of error lacks merit.
INTRODUCTION OF PREJUDICIAL EVIDENCE
In his fourth assignment of error, the defendant asserts the trial court erred in admitting highly prejudicial evidence, consisting of photographs of the victims' bodies and testimony of John Robie ("Robie"), a witness at the scene of the collision.
The defendant argues that he moved pretrial to exclude two photographs, which depicted the burned remains of the victims, from evidence at this trial, and renewed that objection at trial. The defendant fails to specifically identify the two photographs to which he objects. The objection at trial was lodged in response to the offer of the photographs marked as exhibits S-36 through S-40. A review of these photographs reveals photographs of the victims' vehicle, and two of these photographs depict the victims' bodies in the vehicle. The defendant asserts that, following publication of these photographs to the jury, defense counsel noted for the record that one of the jurors made the sign of the cross and began praying. The defendant also argues that, pursuant to an affidavit from his trial counsel introduced in connection with his motion for new trial, a post-trial discussion with jurors supports his argument regarding the prejudicial effect of such photographs. However, as noted above, this court finds it would be improper to consider a summary of alleged comments from jurors. La. Code Evid. art. 606(B) ; Pegues, 56 So.3d at 227.
Generally, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. La. Code Evid. art. 403 ; State v. Small, 2011-2796 (La. 10/16/12), 100 So.3d 797, 813. Photographs are not inadmissible merely because they bring vividly to jurors the details of a shocking crime or tend to arouse passion or prejudice, but rather the test of admissibility is whether the probative value of the photographs outweighs their prejudicial effect. State v. Maiden, 258 La. 417, 426, 246 So.2d 810, 813 (1971). Specifically, photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. State v. Lindsey, 404 So.2d 466, 475 (La. 1981). Even when the cause of death is not at issue, "[t]he state is entitled to the moral force of its evidence and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim." State v. Letulier, 97-1360 (La. 7/8/98), 750 So.2d 784, 795 ;
*592 State v. Robertson, 97-0177 (La. 3/4/98), 712 So.2d 8, 32, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient evidence (i.e., when the prejudicial effect of the photographs substantially outweighs their probative value). State v. Broaden, 99-2124, (La. 2/21/01), 780 So.2d 349, 364, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) ; State v. Perry, 502 So.2d 543, 558-59 (La. 1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). Although the defendant argues that he could have stipulated to the condition of the victims, the state cannot be robbed of the moral force of its case merely because a stipulation is offered. State v. Ball, 99-0428 (La. 11/30/99), 756 So.2d 275, 280. Moreover, it is well-settled that a trial court's ruling with respect to the admissibility of allegedly gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the evidence outweighs its probative value. State v. Maxie, 93-2158 (La. 4/10/95), 653 So.2d 526, 532 n.8. The trial court has considerable discretion in the admission of photographs, and its ruling will not be disturbed in the absence of an abuse of that discretion. State v. Gallow, 338 So.2d 920, 923 (La. 1976).
This court has reviewed the photographs and finds no abuse of discretion in the admission of such photographs. The photographs depicting the victims in the vehicle were limited and were not so gruesome as to overwhelm the jurors and lead them to convict the defendant without sufficient evidence.
The defendant also argues that the testimony of Robie was irrelevant and prejudicial. Robie was traveling on Interstate 10 in the eastbound lanes behind the victims' vehicle and witnessed the impact between the defendant's vehicle and the victims' vehicle. The testimony to which the defendant objected at trial was Robie's observations in the aftermath of the collision, which included the fact that he could see the victims in the vehicle and, after the vehicle burst into flames, he could hear screams from the vehicle and, at some point, the screams stopped. As with the photographic evidence discussed above, the state is entitled to the moral force of its evidence, including testimony of eyewitnesses. State v. Letulier, 750 So.2d at 795. Robie was the only witness to testify that he heard the screams of the victims, and the state did not unduly focus on this testimony. This court finds no abuse of discretion in the ruling of the trial court admitting this testimony.
For the foregoing reasons, this assignment of error lacks merit.
CONCLUSION
The judgment of conviction of five counts of vehicular homicide is modified to a judgment of conviction of five counts of the lesser included offense of negligent homicide; the defendant's sentences are vacated; and the case is remanded to the trial court for resentencing on the modified judgment of conviction.
CONVICTIONS MODIFIED; SENTENCES VACATED; REMANDED TO THE TRIAL COURT FOR RESENTENCING ON THE MODIFIED JUDGMENT OF CONVICTIONS.

In the motion for new trial, the defendant asserted error in the trial court's denial of his requested jury instructions and further asserted that the trial transcript was incomplete and missing the defendant's objections to the failure to include the requested jury instructions, thereby prejudicing him in the preparation of his appeal. In orally ruling on this motion for new trial, the trial court was "unswayed that the requested jury instruction should not have been included," and therefore, found that "the failure to record the charge conference amounted to a material, not inconsequential, omission". The trial court continued, stating that "the requested charges should have been added, or, if not added, a record of his objection recorded for appellate review." As a result, the trial court granted the motion for new trial. After this court denied the state's related supervisory writ application, State v. Leger, 2015-0724 (La. App. 1st Cir. 8/21/15), the supreme court granted the state's writ, noting that the trial court's grant of the motion for new trial was based, at least in part, on the absence in the record of the defendant's objection to the failure of the trial court to instruct the jury with the defendant's proposed jury instructions. However, at the time the writ application was filed with the supreme court, it had been determined that the defendant's objection was in the record, but there remained uncertainty whether the defendant's proposed jury instructions were in the record. Accordingly, the supreme court remanded the matter to the trial court to determine whether the proposed jury instructions were in the record, or alternatively, whether these documents were inadvertently left out of the record. Thereafter, the trial court was ordered to further determine whether the defendant was entitled to a new trial. State v. Leger, 2015-1720 (La. 2/19/16), 184 So.3d 685 (per curiam). Upon remand, the trial court denied the motion for new trial, finding that the inclusion of the defendant's proposed jury instructions resulted in a full and complete record, which extinguished the court's concern as to the defendant's right of review, and further finding that the jury instructions covered the proper law regarding causation.

The co-defendant, Kelsye Hall, was charged in the indictment with counts one through five, and the defendant herein was charged with counts six through ten.

If the person had a blood alcohol concentration at that time of 0.08 percent or more by weight, it shall be presumed that the person was under the influence of alcoholic beverages. La. R.S. 32.662(A)(1)(c).